**Lee Clark WEBB, III, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 1008–85.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 7, 1987.

John R. Leigh, W. John Allison, Jr., on appeal only, Dallas, for appellant.

Henry Wade, Dist. Atty., and Elizabeth L. Phifer, John D. Nation, Chris Ewert and Keith Anderson, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

W.C. DAVIS, Judge.

Appellant was convicted of the offense of driving while intoxicated and punishment was assessed at thirty days confinement in the Dallas County Jail and a $300 fine. Sentence was suspended and appellant was placed on probation for a period of two years. The Court of Appeals for the Fifth Supreme Judicial District reversed the conviction based upon that court's determination that the driver's license checkpoint where appellant was stopped and arrested was an impermissible pretext stop under Art. 6687b, § 13, V.A.C.S.; that court further holding the roadblock as conducted violated appellant's Fourth Amendment rights. Finding the trial court erred in failing to suppress the fruits of the roadblock seizure, the appeals court entered a judgment of acquittal in the case. *Webb v. State*, 695 S.W.2d 676 (Tex.App. Dallas 1985). We granted the State's petition for discretionary review to address the Court of Appeals' holding concerning the constitutionality of the roadblock as well as to address its disposition of the case.

At the hearing on the motion to suppress only one witness testified, Dallas Police Officer Paul Simpson. He testified that on December 17, 1982, he and other officers "had a roadblock set up for checking driver's licenses" from 7:00 p.m. to 10:00 p.m. on Greenville Avenue. After further questioning Simpson admitted that the roadblock was placed on Greenville Avenue because of its proximity to establishments that sold alcoholic beverages. He then also agreed with defense counsel's statement that the "purpose was not a driver's license check but it was, in fact, for a D.W.I. check."

Appellant was stopped at the roadblock at about 9:10 p.m. Simpson and Officer Akins stopped appellant in the middle of Greenville Avenue and asked him to exit his car. Simpson said that he did not hear Akins ask appellant for his driver's license, but that Akins had asked every driver that had come through previously. Simpson smelled alcohol on appellant's breath, observed him, and decided that appellant was intoxicated. He then arrested appellant, took him to a van the police had parked at the site, and eventually transported him to jail.

The State insists that the record shows the roadblock was ostensibly set up as a driver's license checkpoint and not as DWI roadblock. We disagree. Simpson's testimony must be reviewed as a whole, and, as the record reflects, the testimony shows that the roadblock was, at the least, a combination of a DWI roadblock and a driver's license checkpoint. Simpson initially stated that the roadblock was a driver's license checkpoint. But on cross-examination he admitted that it was, in fact, a DWI checkpoint. This testimony and the fact that the police positioned themselves near places which sold alcoholic beverages and had a van waiting to take those arrested to jail, substantiates the claim that the purpose, or at least one purpose of the roadblock was to check for drunken drivers.

■ Appellant was "seized" for purposes of the Fourth Amendment when his automobile was stopped at the roadblock and he was detained. *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d (1975); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Numerous cases have stated that the purpose of this Amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court*, 387 U.S. 523, at 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *Terry*, supra; *Brignoni-Ponce*, supra; *Prouse*, supra; *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). This reasonableness requirement of the Fourth Amendment is implemented by measuring the facts upon which an intrusion is based against " 'an objective standard' whether this be probable cause or a less stringent test," like reasonable suspicion. *Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396. "The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* Three basic standards have evolved from the balancing of the government interest in a law enforcement practice against that practice's intrusion on an individual's Fourth Amendment interests: probable cause, reasonable suspicion, and in those cases where individualized suspicion is not required, a balancing test which includes certain factors like the government's need for the practice, i.e., the public interest, the limitation of the field officers' discretion, and the degree of intrusion on the individual. *Camara*, supra; *Terry*, supra; *Martinez-Fuerte*, supra; *Brown v. Texas*, supra.

Our starting point in evaluating the reasonableness of the DWI roadblock is *Camara*, supra, in which the Supreme Court employed a balancing test to hold that a search, by warrant, not based upon any individualized suspicion was reasonable. *Camara*, supra, involved an administrative inspection program under which a housing inspector was permitted to make a warrantless, routine, annual inspection for violations of the city's Housing Code. The Supreme Court noted that such an inspection is "a less hostile intrusion than the typical

policeman's search for the fruits and instrumentalities of crime." But, the Court also held that such administrative searches are significant intrusions protected by the Fourth Amendment, although not protected by as high a standard as probable cause. The reasonableness of the search was determined by balancing the need to search against the invasion which the search entailed. The Court held that suspicion of the individual premises to any degree was not necessary because of the nature of the inspections. The Court examined three factors in analyzing the reasonableness:

First, such programs have a long history of judicial and public acceptance.... Second, the public interest demands that all dangerous conditions be prevented or abated, yet it is doubtful that any other canvassing technique would achieve acceptable results. Many such conditions—faulty wiring is an obvious example—are not observable from outside the building and indeed may not be apparent to the inexpert occupant himself. Finally, because the inspections are neither personal in nature nor aimed at the discovery of evidence of crime, they involve a relatively limited invasion of the urban citizen's privacy.

*Camara,* supra, is the foundation case for the balancing test in a "suspicionless" search or seizure case. In the 1970's several immigration control cases involving stops discussed, distinguished, and relied upon *Camara,* supra, in determining the applicable standard of reasonableness and the important factors in the balancing test. Because case law applicable to the police use of roadblocks has evolved primarily as a result of these immigration control cases, we now review those cases.

The immigration cases sought to use the lesser standard for evaluating reasonableness by balancing the strong government need for a particular practice against the invasion of privacy caused by the particular practice used. Cf. *Camara,* supra. In the first case, *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) the government sought to rely on *Camara's* lesser standard of reasonableness governing administrative inspections to justify a random vehicular stop and search by a roving patrol of Border Police at a point removed from the border or its functional equivalent. The Court refused to apply Camara's suspicionless search balancing test standard. While acknowledging the government's interest in controlling the flow of illegal aliens, two other key factors were relied upon in this decision, the discretion of the officers and the intrusion upon the individual. The unfettered discretion of the officers in the field was a significant basis in finding the random stop unreasonable. The Court held that absent probable cause or consent, the search was an unreasonable one and violated the Fourth Amendment. The government interest was not so great as to allow such arbitrary intrusions to those using the highways.

*Brignoni-Ponce,* supra, and *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) followed *Almeida-Sanchez,* supra, and also involved Border Patrol seizures and searches. In *Brignoni-Ponce,* the Court held that a roving Border Patrol stop of a moving vehicle was permissible only if the officer is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that a vehicle contains illegal aliens. In arriving at this less than probable cause standard the Court once again balanced the accepted strong government/public interest in preventing the flow of illegal aliens into this country against the "interference with individual liberty that results when an officer stops an automobile and questions its occupants." The Court noted that the intrusion is "modest" because there is no search of the vehicle or its occupants and the visual inspection is limited to what anyone can see standing alongside the vehicle. Brief questioning and possibly the production of a document showing the right to be in the United States is all that occurs. The Court concluded that, "[i]n this case ..., because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border," the

officer may stop the car under the lesser standard of reasonbleness. *Brignoni-Ponce,* 422 U.S. at 881, 95 S.Ct. at 2580.

Contrast *Ortiz,* supra, which was decided at the same time as *Brignoni-Ponce,* supra. The defendant was stopped at a checkpoint and his car was searched. The Court explicitly followed its holding in *Almeida-Sanchez,* supra, and held that "at traffic checkpoints removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause." Again the Court looked at discretion and intrusion, accepting the strong state interest as a "given." In looking at the discretion factor the Court stated that a checkpoint whose location and procedures was determined by "high-level Border Patrol officials" adequately limited the field officers' discretion as to the stop. The Court also stated that the initial intrusion upon an individual stopped at a checkpoint is a lesser intrusion than that imposed when stopped by a roving patrol because a checkpoint is less likely than a roving patrol to cause fright and annoyance since all other motorists are also stopped. The Court also felt it less intrusive when motorists can see visible signs of the officers' authority as at a checkpoint rather than a single random stop. However, as in the other border control cases, the two most significant factors in the Court's decision—discretion and intrusion—were still too great under the balancing test as to the *search* of the car. Unfettered discretion was left to the officers in the field as to which cars to search and as to the intrusiveness of the search. The officers searched only vehicles that aroused their suspicion, for whatever reason. This "official arbitrariness" and the intrusiveness of a search of a vehicle violated the Fourth Amendment. The Court held that the higher standard of probable cause to search must govern such searches.

This need to police the border and the corresponding lack of practical and effective alternatives noted in previous cases showed itself in another border case, *Martinez-Fuerte,* supra. The Court stated that previous cases "have recognized that maintenance of a traffic-checking program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border." The Court weighed the serious need for permanent checkpoints in light of the lack of effective alternatives and in light of the substantial influx of illegal aliens. While the interest was the same very important concern with immigration control as that discussed in *Brignoni-Ponce,* supra, the Court found significant difference in the use of a checkpoint operation. The need to control the border, the lack of effective alternatives and the method in which the operation was conducted, was balanced against the intrusion on Fourth Amendment interests caused by the checkpoint, an intrusion which the Court characterized as "quite limited."

First, the Court noted the need to control the border and the lack of an effective practical alternative. Next, the Court examined the intrusiveness aspect, noting that the checkpoint stop, as opposed to the roving stop, is much less likely to be frightening or annoying because a motorist can see visible signs of the officers' authority and that all motorists are processed through the checkpoint. Also in that case, neither the vehicles nor occupants were searched and the questioning was brief. Finally, the Court reviewed the discretion factor and stated that at least as to the stop, the discretion exercised by the field officers was limited since all cars went through the checkpoint and the location of the checkpoint was not chosen by the officers in the field. The *Martinez-Fuerte* Court then concluded that, as in *Camara,* supra, no particularized suspicion of an individual was necessary for checkpoint stops because the reasonable procedures made the intrusion minimal, while the public interest in such stops as well as the need for this particular technique was great. The Court limited its holding "to the type of stops described in this opinion." " '[A]ny further detention ... must be based on consent or probable cause.' " *Martinez-Fuerte,* 428 U.S. at 567, 96 S.Ct. at 3087.

The next important case in the development of the Fourth Amendment law involving suspicionless vehicular stops was *Dela-*

*ware v. Prouse*, supra. Although *Prouse*, supra, involved a random stop for a driver's license check, rather than an immigration checkpoint, the Supreme Court relied upon the previously discussed border control cases to hold that the stop was unreasonable. The Court noted that in *Prouse*, as in *Brignoni-Ponce*, both supra, where roving Border Patrol officers stopped vehicles without cause, a standard requiring specific, articulable facts upon which reasonable suspicion would be based would be an adequate means by which the government could guard the public interest in highway safety and yet still protect individuals from the intrusion of official interference. The Court placed some significance upon the difference in "the subjective intrusion" upon Fourth Amendment interests created by a roving, random stop and that created by a checkpoint as in *Martinez-Fuerte*, supra. The majority felt that the unsettling show of authority caused by a random stop is not occasioned by the checkpoint where all are subjected to a show of the police power of the community. *Prouse*, 440 U.S. at 657, 99 S.Ct. at 1398; see also *Martinez-Fuerte*, supra.

The Court also examined the vital state interest in promoting highway safety by stopping and checking for valid driver's licenses. Significantly, the Court noted that while highway safety was a vital interest, the State had other methods to insure that drivers were licensed and that automobiles were safe. "Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment." *Id.* 440 U.S. at 659, 99 S.Ct. at 1399. Cf. *Camara*, supra, where the absence of alternative measures was a key consideration. Finally, the Court discussed the dangers of discretion in permitting random stops and concluded that articulable and reasonable suspicion

was necessary to seize a motorist. Apparently distinguishing random, or roving, checks from other, less intrusive types of fixed roadblock stops, the Court offered a disclaimer to its holding: "This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." 440 U.S. at 663, 99 S.Ct. at 1401. This dicta must be read in the context of the reasonableness test required by the Fourth Amendment and implemented by the Court in its decisions. When so read, it becomes apparent that a fixed checkpoint, as opposed to a roving stop, is a less intrusive alternative procedure.

As shown by the previous cases, the Supreme Court's utilization of the Fourth Amendment balancing test for the suspicionless stop involves three main considerations which we will sum up infra: (1) the interest or need of the government for the particular practice; (2) the discretion exercised by officers in the field; and (3) the intrusion caused to the individual by this discretion and practice.[1] Cf. *Brown v. Texas*, supra.

The first of the three, the government interest or need for the particular law enforcement practice, is critical to a Fourth Amendment analysis. That need is determined by the type and gravity of governmental and public interest involved. For example, highway safety and immigration control have been the two vital interests before the Supreme Court. *Prouse*, supra; *Brignoni-Ponce*, supra; *Martinez-Fuerte*, supra. But, as shown by the cases, the governmental interest is only part of the consideration. Cf. *Brignoni-Ponce*, supra. Another crucial part of the consideration of need is the availability of practical effective alternative means to deal with the

---

**1.** These three considerations correspond to the three factors listed in *Brown v. Texas*, supra, namely, (1) gravity of the public concerns served by the seizure; (2) the degree to which the seizure advances the public interest; and (3)

the severity of the interference with individual liberty. *Brown v. Texas*, 443 U.S. at 51, 99 S.Ct. at 2640. Our characterization is simply more specific, but encompasses the same considerations.

problem. *Prouse*, supra; *Martinez-Fuerte*, supra; cf. *Camara*, supra.

The second consideration emphasized when applying the balancing test concerns discretion of the officer in the field. The discretion of the officer in the field, at least as to the *initial* stop, must be limited in order for the stop to be reasonable and avoid arbitrariness. For this reason, arbitrary, random stops not based on at least articulable suspicion are illegal. *Prouse*, supra; *Brignoni-Ponce*, supra; cf. *Ortiz*, supra. Yet, checkpoint or roadblock stops may be legal, even though the stop is not based on any articulable, individualized suspicion of violations of the law. The procedures of the roadblock are examined to be certain neutral criteria are employed in choosing the location and regulating the operation. These plans and decisions should be performed by administrative personnel or "higher-ups," rather than officers in the field. *Martinez-Fuerte*, supra. The stops must be non-arbitrary systematic stops and the officers conducting the operation must not enjoy "unbridled discretion" in deciding who to stop or what procedures are to be followed. *Prouse*, supra.

The third consideration is the level of intrusion. The Supreme Court addresses intrusion on two levels, an objective level and a subjective level. *Martinez-Fuerte*, supra. The characteristics of the stop itself, like the non-arbitrary procedures used, the safety precautions and interference with traffic constitute the objective intrusion. The inconvenience and anxiety to motorists are the subjective intrusions, the more emotional aspect.

These three factors have been utilized by various states examining the DWI roadblock issue. Most state courts have focused on the procedures employed in setting up and operating the suspicionless stops at roadblocks, cf. *People v. Bartley*, 109 Ill.2d 273, 93 Ill.Dec. 347, 486 N.E.2d 880 (1985), when analyzing the constitutionality of the stop itself. We will discuss generally the various state cases in light of the balancing test factors.

The first balancing factor, the need or public interest of a state, is taken for granted in many cases. The statistics of alcohol-related deaths in the nation are occasionally cited, but, in most cases the generally accepted state interest in keeping the roads safe and also in deterring people from driving drunk is considered a sufficient showing of need. *People v. Bartley*, supra. Very few cases mention the notion of a lesser intrusive alternative method when discussing the public interest or state need, a consideration the Supreme Court has indicated may be part of the balancing process in a suspicionless stop situation. Cf. *People v. Bartley*, supra; *Brignoni-Ponce*, supra. One reason for this may well be that the "less intrusive" alternative methods encompass fixed checkpoints operated according to neutral criteria rather than roving or random stops operated under the "unbridled discretion" of field agents. See *Prouse* and *Martinez-Fuerte*, both supra. Further, very few states have considered the comparative effectiveness over time of the roadblock intrusion to the usual stop and arrest on the basis of observed facts showing reasonable suspicion, cf. *State v. Coccomo*, 177 N.J.Super. 575, 427 A.2d 131 (1980), although, again, such a strict comparison does not appear to be an absolute predicate for a State's implementing other, minimally intrusive methods of enforcement which adequately meet Fourth Amendment criteria.

Turning to the discretion factor, we find much discussion focuses on this area because the neutral criteria of the procedures are emphasized. Several cases enumerated thorough, specific, neutral criteria which, consistent with Supreme Court law, must be utilized to limit the discretion of the officers in the field as much as possible. *State v. Coccomo*, supra; *State v. Deskins*, 234 Kan. 529, 673 P.2d 1174 (1983); *Little v. State*, 300 Md. 485, 479 A.2d 903 (1984); *State v. Super. Ct. in & for County of Pima*, 143 Ariz. 45, 691 P.2d 1073 (1984). Some of these criteria include requirements that supervisory personnel, "higher-ups", not the field officers should plan the roadblock and its method of operation; that every car or every $n$th car should be stopped; that safety considerations such as the location of the roadblock, adequate ad-

vance warning to motorists and parking lots or areas off the road to remove those who are detained, should be included. This list of factors is not all-inconclusive nor does it appear that other jurisdictions require the presence of every factor listed before finding the criteria adequate.

The intrusiveness factor is also discussed in terms of the procedures employed in operating the roadblock. For example, most states require advance notice be given that roadblocks will be set up; that adequate visual warnings to the individual motorists that the roadblock is ahead be given to help reduce the degree of fear and anxiety generated by the roadblock; that the length of time of the detention be brief; and that interference with traffic flow be considered. See *State v. Deskins*, supra; *State v. Coccomo*, supra; *State v. Super. Ct.*, supra.

All of these factors and additional ones have been considered by other states in discussing the constitutionality of a DWI roadblock. See *Little v. State*, supra; and *State v. Garcia*, 500 N.E.2d 158 (Ind.Sup. Ct.1986). Most states, even those which have held a particular roadblock unconstitutional, focus on the *procedures* used in terms of analysis of the constitutionality of the roadblock process. *State ex rel. Ekstrom v. Justice Court*, 136, Ariz. 1, 663 P.2d 992 (1983); *Commonwealth v. McGeoghegan*, 389 Mass. 137, 449 N.E.2d 349 (1983). Those cases hold that if certain procedures are followed a roadblock would be constitutional. Compare *Commonwealth v. Trumble*, 396 Mass. 81, 483 N.E. 2d 1102 (1985), (approving a roadblock which corrected omissions noted in *Commonwealth v. McGeoghegan*, supra) and *State v. Super.Ct.*, supra, noting the same corrections omitted in *State ex rel. Ekstrom v. Justice Court*, supra; *State v. Deskins*, supra; *State v. Coccomo*, supra. But cf. *People v. Richard T.*, 185 Cal.App. 3d 855, 229 Cal.Rptr. 884 (Calif.Ct.App.— 4th Dist.1986).

We turn now to the instant case to examine the validity of the DWI roadblock as well as to examine the constitutionality of the particular roadblock at issue. We utilize the balancing test set out by the Supreme Court for suspicionless seizures, bearing in mind the analysis done by other states. Thus, we weigh the public interest against the intrusion imposed upon the individual in light of the three factors: (1) the need or interest of the state; (2) the discretion given to the officers; and (3) the intrusion, subjective and objective, upon the individual. *Brown v. Texas*, supra.

## I. STATE INTEREST

■ Looking first to the State interest involved, it is beyond doubt that a strong public interest exists in reducing the "carnage caused by drunk drivers." *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). The safety of the highways is indeed a vital concern of the State. Deterrence of drunk driving is likewise an important aspect of overall highway safety. But, while we are cognizant of the inherent safety problem caused by the mixing of alcohol and driving, we have not been presented with empirical data as to the necessity for, or effectiveness of, sobriety checkpoint deterrence in relation to traditional means of deterring drunk drivers. In fact, an increased number of highly visible patrols watching for erratic driving may be a more effective and economical means of apprehending drunk drivers than a roadblock. See Jacobs and Strossen, "Mass Investigation Without Individualized Suspicion: A Constitutional and Policy Critique of Drunk Driving Roadblocks," 18 U.C.D.I. Rev. 595 (1985). However, this is not to say that a proper roadblock can never be used in place of or in conjunction with traditional methods simply because traditional means are available. At this time we simply have insufficient data to determine the practicality or effectiveness of such measures, and therefore cannot specifically weigh them in our balancing formula. We can, however, accept in the abstract the important governmental interest involved and weigh the intrusiveness of a roadblock stop, both in the abstract and here, and it is to that which we now turn.

## II. INTRUSIVENESS

As earlier stated, the intrusiveness of a roadblock stop is both objective and subjective. *Martinez-Fuerte,* supra. States upholding the constitutionality of a roadblock stop have highlighted the objective characteristics and non-arbitrary procedures used by law enforcement officials in setting up and maintaining the checkpoint in question. Safety of motorists, visibility of the upcoming stop, advance notice of the operation, brief initial detention and interference with normal traffic flow are all objective considerations. These objective factors, in turn, react with and may help to alleviate or exacerbate the subjective feelings and anxiety a motorist may feel upon being confronted and detained, even for a brief period of time.

In *Commonwealth v. McGeoghegan,* supra, that court considered whether a sobriety checkpoint could ever be constitutionally permissible. With consideration of relevant Supreme Court decisions in the area, the court suggested that for a roadblock to be permissible, "the selection of motor vehicles to be stopped must not be arbitrary, safety must be assured, motorists' inconvenience must be minimized and assurance must be given that the procedure is being conducted pursuant to a plan devised by law enforcement supervisory personnel." 389 Mass. at 143, 449 N.E.2d 349.

Turning its attention to the subjective aspects of intrusion, the court noted that advance notice of publicity of the operation, while not constitutionally mandated, would "have the virtue of reducing surprise, fear, and inconvenience." *Id.* The State of Massachusetts' adherence to the factors played a large part in that court's approval of a later roadblock checkpoint in *Commonwealth v. Trumble,* supra. And case law from other states which have considered roadblocks executed under such guidelines are supportive of the position. See, e.g., *Stark v. Perpich,* 590 F.Supp. 1057 (D.Minn.1984); *State v. Golden,* 171 Ga.App. 27, 318 S.E.2d 693 (1984); *Little,* supra. See also *State v. Deskins,* supra; *Kinslow v. Commonwealth,* 660 S.W.2d 677 (Ky.Ct.App.1983); *State v. Coccomo,* supra; *People v. Scott,* 122 Misc.2d 731, 471 N.Y.S.2d 964 (1983). Cf. *State ex rel. Ekstrom v. Justice Court,* supra.

The subjective intrusion occasioned by a roadblock, because it includes by logical extension a serious criminal investigative aspect generating apprehension and anxiety in those citizens affected, must be counter-balanced by sufficient publication and procedural safeguards to protect the individual motorist. Here, the State argues that every vehicle was stopped on a particular street for a brief time period. It is argued that "many of the same limitations of the 'fear factor' are present in the roadblock at issue," since potential interference with legitimate traffic was minimal, and motorists had adequate notice of the impending stop due to the presence of uniformed officers. We cannot agree. First, traffic was stopped in the middle of the street, instead of individual vehicles being shunted off to one side in a safe manner once specific, articulable facts demonstrated the probability of a motorist's intoxication. Second, it is illogical to presume that a motorist's personal feelings of anxiety would be better relieved by what amounts to a sudden and unexplained show of police authority than if the roadblock was publicized beforehand and properly illuminated at and before the scene by sign and signal. Third, there was absolutely no evidence of formal, neutral guidelines formulated by superior law enforcement officials and presented for use without individual discretion to field officers conducting the roadblock on Greenville Avenue. It is to that third area we now turn our attention.

## III. DISCRETION

■ The Fourth Amendment requires that a seizure be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, *or* that the seizure be carried out pursuant to a plan embodying explicit, neutral limtiations on the conduct of individual officers in the field. *Brown,* supra; *Prouse,* supra; see also *Martinez–Fuerte,* supra. Field discretion may be limited by superior law enforcement offi-

cials' promulgation and implementation of neutral guidelines proscribing the arbitrary selection of vehicles to be stopped and clearly setting out the proper procedures to be followed. See *Commonwealth v. Trumble,* supra; *State v. Deskins,* supra.

In *Trumble,* the roadblock was conducted pursuant to a plan developed by State Police supervisory personnel, which included training of all ranks of officers. Publicity preceding the roadblock included stories carried in the newspapers as well as on television and radio.

At the site of the operation, thirteen uniformed troopers participated. Five hundred feet before the stopping area a large sign notified on-coming traffic of the stop ahead. In addition, a police cruiser with all of its lights illuminated was parked directly across from the sign. Safety flares were positioned throughout the roadblock area. A second sign and several flares were placed three hundred feet before the stopping point. At the actual stopping point, four cruisers and a police van brightly lit up the area.

The officers were strictly instructed to follow without deviation the guidelines handed down by their superiors. Every automobile was to be stopped. The detention would be brief, the individual officers making only a short courteous explanation of the purpose for the roadblock and apologizing for the inconvenience. Only "upon observing an articulable sign of possible intoxication", would the officer be warranted to engage in *further* conversation, such as a request for a driver's license or question about alcohol consumption. Id. Then, "if after a brief stop, the officer develops specific and articulable facts which lead the officer to believe the motorist may be intoxicated" the motorist would be requested to drive to the shoulder of the road, produce identification and registration, and perform certain motor coordination tests. Id. In other words, the initial intrusion would be brief and to the point. Any "in-

vestigation" would have to be based upon articulable suspicion of intoxication and such further action would take place outside the normal flow of traffic.

In addition to participation by the police agencies, guidelines under *Trumble* included participation by the district attorney's office and the keeping of accurate records of each operation. In the case at bar, comparison of the Dallas police force's operation with that of the Massachusetts roadblock clearly demonstrates the failure of the Greenville Avenue checkpoint to comply with the "neutral guidelines" requirement basic to any such operation passing constitutional muster. Just as the State failed in its brief to demonstrate what procedural guidelines were promulgated and implemented at the particular roadblock in question, our review of the record discloses no evidence that the officers manning the roadblock were acting according to neutral criteria as suggested in *Prouse,* supra, and as set forth in *Trumble* and *Deskins,* both supra.[2]

■ We will note that a "neutral plan", without more, does not fulfill Fourth Amendment reasonableness requirements. Cf. *Brown v. Texas,* supra. The *procedures* may be neutral, but the entire scheme seen in the whole may nevertheless be violative of the Fourth Amendment's prohibition against unreasonable seizures. *Meeks v. State,* 692 S.W.2d 504 (Tex.Cr. App.1985) is a perfect example. In *Meeks,* a variety of different law enforcement agencies supplied officers to man a roadblock set up on U.S. Highway No. 90 in West Texas between Sanderson and Marathon. At trial, the evidence reflected that the roadblock was set up to "enforce all the laws," the different agencies working together on "anything that would be a violation of some type." 692 S.W.2d at 506. The State in that case argued that the all-purpose roadblock was permissible under Article 6687(b), § 13, supra. We disagreed, citing as authority earlier cases

**2.** The court in *Trumble* included as an appendix to its opinion the guidelines promulgated by law enforcement agencies for a proper roadblock operation in that state. We would refer our

own officials to that case, as well as the procedures outlined in the *Deskins* case, for the guidelines contained therein.

standing for the proposition that the statute in question does not provide carte blanche authority for "fishing expeditions"; while a license checkpoint is allowed under the statute, such an operation cannot be used as a subterfuge to cover up unlawful activity. *Meeks v. State*, supra, citing *McMillan v. State*, 609 S.W.2d 784 (Tex.Cr. App.1981); *White v. State*, 574 S.W.2d 546 (Tex.Cr.App.1979); *Faulkner v. State*, 549 S.W.2d 1 (Tex.Cr.App.1977). See also *Hall v. State*, 488 S.W.2d 788 (Tex.Cr.App.1973); *Pruitt v. State*, 389 S.W.2d 475 (Tex.Cr. App.1965). Under our prior case law, it is clear that the mere request for a motorist's license will not validate the stopping of an automobile under the authority of Art. 6687b, § 13, supra, if it is not clear the driver's license check was the reason for the detention. See *Razo v. State*, 577 S.W. 2d 709 (Tex.Cr.App.1979); *Fatemi v. State*, 558 S.W.2d 463 (Tex.Cr.App.1977); *Faulkner v. State*, supra, *Hall v. State*, supra.

The above discussion of *Meeks v. State*, supra, serves two purposes. First, it is clear from *Meeks* and its predecessor opinions that the instant roadblock operation would not be validated under the auspices of Art. 6687b, § 13, supra. Second, the *Meeks* court left unresolved the issue whether the Texas scheme for license checks meets Fourth Amendment constitutional muster under *Delaware v. Prouse*, supra, and under our own state constitution, Art. I, § 9, supra, since the Court had previously held that *Prouse* would not be given retroactive effect. See *McMillan v. State*, supra; *Luckett v. State*, 586 S.W.2d 524 (Tex.Cr.App.1979). We do not reach that specific question here, but denote in passing that the language in *Prouse*, supra, regarding "neutral criteria" and official "guidelines" may have an equal impact on driver's license as well as sobriety checkpoint stops, regardless of the fact that the former type of stop is permitted by inspection statute while the latter type has not yet been effectuated by legislative or administrative action.

What *Meeks v. State*, supra, does make clear is that, under state law, a fixed but general purpose investigatory stop is not permissible by statute. We now find that the similar "combination" stop violates the Fourth amendment protections as set out in *Delaware v. Prouse*, supra, and Art. I, § 9 of the Texas Constitution. Under proper circumstances, a roadblock operation established solely for the purpose of determining a motorist's sobriety may be constitutionally permissible under both our state and federal constitutions, but in this case we agree with the appeals court that the Greenville Avenue roadblock lacked proper constitutional safeguards and operational guidelines designed to protect motorists from unreasonable seizure, and was in fact a subterfuge for a general investigatory sweep of motorists in the area.

However, contrary to the Court of Appeals disposition, an acquittal is not the proper remedy. Accordingly, the judgment of the Court of Appeals is affirmed but the disposition is modified, with the cause remanded to the trial court for further proceedings consistent with the opinion.

ONION, P.J., and McCORMICK and WHITE, JJ., concur in the result.

CLINTON, MILLER and DUNCAN, JJ., disagree with the analysis in the lead opinion, beginning on page 804 of the "starting point" through the conclusion that such a roadblock "may be constitutionally permissible," at page 812. Only the result is correct.

TEAGUE, J., only concurs in the result. He subscribes in principle with what the Dallas Court of Appeals has stated in this cause, in *Padgett v. State*, 723 S.W.2d 780 (Tex.App.—Dallas 1987); and *Higbie v. State*, 723 S.W.2d 802 (Tex.App.—Dallas 1987). Therefore, the State's PDR should be refused as having been improvidently granted; except where the judgment reflects an acquittal it should be reformed to show a reversal.