SITZ v DEPARTMENT OF STATE POLICE

Docket No. 93823. Submitted July 27, 1987, at Detroit. Decided
August 1, 1988. Leave to appeal applied for.

The Michigan Drunk Driving Task Force of the Department of
State Police initiated a sobriety checkpoint pilot program under
which all motorists would be stopped upon reaching a check-
point and be examined for signs of intoxication. Where intoxi-
cation was indicated, a motorist would be directed to an out-of-
traffic location, his driver's license and car registration would
be checked, and further sobriety tests, including a Breathalyzer
test, would be administered. If the examining officer concluded
that a motorist was intoxicated, the officer would have discre-
tion to arrest the motorist. Rick Sitz and several other individu-
als holding Michigan drivers' licenses brought an action in the
Wayne Circuit Court against the Department of State Police
and its director, Gerald L. Hough, seeking a declaration that
the sobriety checkpoint plan violates US Const, Am IV and
Const 1963, art 1, § 11. Plaintiffs also sought an injunction
against any additional sobriety checkpoints on state highways.
Following a bench trial, the court, Michael L. Stacey, J.,
concluded that defendants' sobriety checkpoint plan violated
the federal and state constitutions and entered an order perma-
nently enjoining defendants from implementing their plan.
Defendants appealed.

The Court of Appeals *held:*

1. Stopping a vehicle and detaining its occupants, while less
intrusive than a traditional arrest, is a seizure within the
meaning of the Fourth Amendment. Consideration of the con-
stitutionality of such a seizure involves a weighing of the
gravity of the public concerns served by the seizure, the degree
to which the seizure advances the public interest, and the
severity of the interference with individual liberty. In applying
this test to defendants' sobriety checkpoint plan, the trial court

REFERENCES
Am Jur 2d, Automobiles and Highway Traffic § 304.
Am Jur 2d, Searches and Seizures §§ 2, 96.
Validity of rountine roadblocks by state or local police for purpose
of discovery of vehicular or driving violations. 37 ALR4th 10.

did not clearly err in concluding that, although there is a legitimate state interest in curbing drunk driving, the sobriety checkpoint program did not significantly further the public interest in curbing drunk driving and that it subjectively intruded on individual liberties.

2. The sobriety checkpoint program violates Const 1963, art 1, § 11 inasmuch as art 1, § 11 offers at least the same protection as accorded by the Fourth Amendment.

Affirmed.

1. SEARCHES AND SEIZURES — MOTOR VEHICLES.

A stop of a motor vehicle and the detention of its occupants, while less intrusive than a traditional arrest, is a seizure within the meaning of the Fourth Amendment; consideration of the constitutionality of such a seizure involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty (US Const, Am IV).

2. SEARCHES AND SEIZURES — MOTOR VEHICLES — SOBRIETY CHECKPOINTS.

The sobriety checkpoint program of the Drunk Driving Task Force of the Department of State Police under which all motorists would be stopped upon reaching certain checkpoints on state highways to be examined for signs of intoxication violates both the Fourth Amendment to the United States Constitution and art 1, § 11 of the Michigan Constitution (US Const, Am IV; Const 1963, art 1, § 11).

*Stark & Gordon* (by *Deborah L. Gordon*), *Mark R. Granzotto,* and *William Gage,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Thomas L. Casey,* Assistant Solicitor General, and *Patrick J. O'Brien,* Assistant Attorney General, for defendants.

Before: GRIBBS, P.J., and HOLBROOK, JR., and N. J. LAMBROS,* JJ.

N. J. LAMBROS, J. This case presents the ques-

_____
* Circuit judge, sitting on the Court of Appeals by assignment.

tion of the constitutionality of sobriety check-points. Although this issue has been addressed by the courts of over one-half of the states in this country, the Michigan appellate courts have not before now had occasion to consider this important issue.[1] In a comprehensive sixty-page opinion following a bench trial of this case, Wayne Circuit Judge Michael L. Stacey concluded that the defendants' sobriety checkpoint plan violated both the Fourth Amendment of the United States Constitution and art 1, § 11 of the Michigan Constitution. The court accordingly entered an order permanently enjoining defendants from implementing their plan to conduct sobriety checkpoints along state highways. We affirm.

I

1982 PA 310 established the Michigan Drunk Driving Task Force in the Department of State Police, MCL 257.625j; MSA 9.9325(10). The Task Force was charged with reviewing all aspects of the drunk driving problem in the state. In September, 1985, the Task Force submitted its final report which set forth thirty-five recommendations for combating alcohol-related traffic accidents. One suggestion was the implementation of sobriety checkpoints on public highways. Due to legislative opposition, defendants did not attempt to implement sobriety checkpoints at that time.

In his State of the State Address on January 29, 1986, Governor Blanchard directed defendants to implement a sobriety checkpoint pilot program. In February, 1986, defendant Gerald L. Hough, Director of the Michigan Department of State Police,

---

[1] In *People v Whalen*, 390 Mich 672, 683; 213 NW2d 116 (1975), the Michigan Supreme Court expressly declined to rule on the constitutionality of systematic roadblock stops.

appointed a Sobriety Checkpoint Advisory Committee, composed of representatives of the State Police, local law enforcement officials, prosecuting attorneys, and the University of Michigan Transportation Research Institute. The committee drafted guidelines for the program. The guidelines set forth procedures as to site selection, publicity, and operation of the checkpoint, including briefing, scheduling, safety considerations, motorist contact, staffing and assignment of duties.

Under the program, checkpoints would be established at certain sites along state highways. All motorists would be stopped upon reaching a checkpoint and would be examined for signs of intoxication. Should the examining officer find indications of intoxication, the officer would direct the driver to an out-of-traffic location, check the driver's license and car registration, and possibly conduct further sobriety tests, including a Breathalyzer test. If the officer concluded that the driver was intoxicated, the officer would have discretion to arrest the driver; should the officer conclude the driver was not intoxicated, the driver was to be released.

The first sobriety checkpoint operation was conducted at Dixie Highway and Gretchen Road in Saginaw County on May 17 and 18, 1986. The Saginaw County Sheriff's Department cooperated in the operation which lasted from about 11:45 P.M. to 1:00 A.M. One hundred twenty-six vehicles passed through the checkpoint in that time, with an average delay to motorists of twenty-five seconds or less. Two drivers were retained for sobriety field tests; one was arrested for driving while under the influence of alcohol. A third driver drove through the checkpoint without stopping, was pulled over by an officer in an observa-

tion vehicle, and was arrested for driving under the influence.

This action was commenced on May 16, 1986, with the filing of plaintiffs' complaint for a declaratory judgment and injunctive relief. Plaintiffs are licensed drivers of the State of Michigan who regularly travel throughout the state in their automobiles. During the course of the initial proceedings, defendants agreed to delay implementation of the sobriety checkpoint program pending resolution of the case.

Trial took place from May 29, 1986, through June 3, 1986. In its opinion dated June 24, 1986, the trial court found that, although there was statutory authority for the operation of the sobriety checkpoints, the plan violated the Fourth Amendment to the United States Constitution and art 1, § 11 of the Michigan Constitution. Defendants challenge both these findings on appeal.

II

The Fourth Amendment to the United States Constitution provides in pertinent part:

> The right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated.

The United States Supreme Court has distinguished the high expectation of privacy an individual has in a home from the lesser privacy interest in an automobile. *South Dakota v Opperman,* 428 US 364; 96 S Ct 3092; 49 L Ed 2d 1000 (1975). As a result, the Fourth Amendment does not afford the same level of protection against searches and seizures without warrants of automobiles as of a residence. *Chambers v Maroney,* 399 US 42; 90 S

Ct 1975; 26 L Ed 2d 419 (1970), reh den 400 US 856; 91 S Ct 23; 27 L Ed 2d 94 (1970). Nonetheless, stopping a vehicle and detaining its occupants is a seizure within the meaning of the Fourth Amendment. *Delaware v Prouse,* 440 US 648, 653; 99 S Ct 1391; 59 L Ed 2d 660 (1979).

The Supreme Court first considered the use of roadblocks for investigatory stops in two border patrol cases. In *United States v Brignoni-Ponce,* 422 US 873; 95 S Ct 2574; 45 L Ed 2d 607 (1975), two officers on roving patrol stopped a vehicle to determine whether it was transporting illegal aliens. The officers admitted they had no reason to suspect the car was being used for illegal purposes. The Court held that while probable cause is not required for such a stop, the border patrol could not arbitrarily stop automobiles without some grounds:

> Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country. [*Brignoni-Ponce, supra,* 422 US 884.]

In reaching its decision, the Court weighed the state's interest in preventing illegal immigration and the effectiveness of such stops in combating the problem against a brief delay and minimal intrusion imposed on motorists.

In *United States v Martinez-Fuerte,* 428 US 543; 96 S Ct 3074; 49 L Ed 2d 1116 (1976), the Court held that permanent checkpoints on major highways near the Mexican border were constitutional. Such checkpoints stopped all vehicles and the occupants were questioned briefly in an effort to apprehend illegal aliens. Though still a seizure,

the Court concluded that the governmental interest in stemming illegal immigration outweighed the minimal intrusion made on motorists. *Martinez-Fuerte, supra,* 428 US 564. The Court again reviewed the public interest served, whether the procedure was an effective approach to the problem, and the objective and subjective intrusion on an individual's privacy interest.

In *Brown v Texas,* 443 US 47, 50-51; 99 S Ct 2637; 61 L Ed 2d 357 (1979), the Supreme Court synthesized the factors to be considered in determining the constitutionality of seizures less intrusive than traditional arrests:

> Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

### III

The trial court employed the *Brown* test, balancing the state's interest in preventing accidents caused by drunk drivers, the effectiveness of sobriety checkpoints in achieving that goal, and the level of intrusion on an individual's privacy caused by the checkpoints. The parties to this appeal agree, as do we, that the *Brown* three-prong balancing test was the correct test to be used to determine the constitutionality of the sobriety checkpoint plan. Applying the *Brown* test to the evidence presented, the trial court concluded that, although there is a grave and legitimate state interest in curbing drunk driving, the sobriety checkpoint program did not significantly further the public interest in curbing drunk driving and subjectively intruded on individual liberties. It is

the latter two findings that defendants claim are erroneous.

In reviewing the trial court's findings, we are mindful that the findings of fact by the trial court are not to be set aside unless they are clearly erroneous. MCR 2.613(C). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with a definite and firm conviction that a mistake has been committed. *Tuttle v Dep't of State Highways*, 397 Mich 44, 46; 243 NW2d 244 (1976). Due regard shall be given to the special opportunity of the trial court to judge the credibility of the trial witnesses.

### A

The gravity of the drunk driving problem in the State of Michigan is undeniable. The evidence presented at trial indicated that alcohol was a contributing factor in about twenty-five to fifty percent of motor vehicle fatalities. It is undisputed that the state has a serious and legitimate interest in curbing drunk driving.

### B

In concluding that sobriety checkpoints were not an effective means of combating drunk driving, the trial court found: (1) the degree to which a sobriety checkpoint program would deter drunk driving was directly related to the program's success in achieving actual arrests; (2) sobriety checkpoints were not an effective means of actually apprehending drunk drivers; and (3) the statistical data and testimony presented at trial demonstrated, at most, a short-term deterrent effect. We are convinced from our review of the evidence presented

at trial that the trial court's findings were not clearly erroneous.

Specifically, the trial court's finding of a causal relationship between a program's success in achieving actual arrests and deterrence was supported by the testimony of plaintiffs' expert witness, Dr. Lawrence Ross, who has extensively researched issues relating to drinking and driving. Ross testified that available data indicated that one percent or fewer of the drivers passing through sobriety checkpoints are arrested for drunk driving. He further indicated that while studies indicated a short-term deterrent effect resulting from various campaigns against drunk driving, the statistics eventually returned to their normal level. Ross' explanation for this phenomenon was that while the publicity which accompanies the initiation of such programs leads the public to believe that the chances of being caught are high, once people learn that the chances of apprehension are not that high, people return to their normal behavior.

Additionally, defendants' own evidence strongly supports the finding of a causal relationship between actual arrests and deterrence value. Part II of the Sobriety Checkpoint Program Guidelines states in pertinent part:

> Therefore, if drunk driving is to be reduced significantly through law enforcement efforts, motorists must be persuaded that if they drive while intoxicated, there is a strong likelihood they will be arrested and face the ensuing consequences. Authorities agree that many drunk drivers persist in their behavior because of a perceived low risk of arrest.

Similarly, the first objective listed in part v of the guidelines is to "[i]ncrease the perception of 'risk

of apprehension' in the minds of those drivers who would operate a vehicle while under the influence of alcohol or controlled substances."

Finally, we note that the ability of a particular law enforcement technique to effectuate actual arrests was deemed a relevant factor by the United States Supreme Court in its analyses in *Martinez-Fuerte, supra,* p 554, and *Prouse, supra,* p 660. Based on our review of the record, the trial court's conclusion, that the deterrent effect of the program would decline with the public's learning that the program was not, in fact, an effective tool for arresting drunk drivers, was not clearly erroneous.

Secondly, the court's finding that checkpoint programs were not an effective means for achieving actual arrests is supported by uncontroverted evidence. Dr. Ross' testimony regarding the low actual arrest rate of checkpoint programs was corroborated by the testimony of one of defendants' witnesses, Lieutenant Raymond Cotten of the Maryland State Police. The Michigan program was modeled after the Maryland program. Colonel Hough testified to his understanding that other states which had tried checkpoint programs were not achieving high rates of actual arrests from the programs. The trial court additionally noted that the figures reported in appellate decisions of other states reflect the fact that checkpoint programs yield very low drunk driving arrest rates. The court's finding that checkpoint programs are not an effective means for achieving actual arrests is not clearly erroneous.

The trial court carefully examined the evidence presented as to the deterrent effect of sobriety checkpoints. While Dr. Ross acknowledged the potential for a short-term deterrent effect of a program supported by adequate publicity, he testified that he knew of no credible studies demon-

strating that sobriety checkpoints were an effective technique for long-term deterrence of alcohol-related fatalities. Colonel Hough acknowledged that he had not seen empirical evidence showing a strong deterrent effect. Lieutenant Cotten admitted, as well, that he was unable to opine that checkpoints had a statistically significant deterrent effect. In fact, Maryland had conducted a study comparing traffic statistics between a county using checkpoints and a control county. The results of the study showed that alcohol-related accidents in the checkpoint county decreased by ten percent, whereas the control county saw an eleven percent decrease; and while fatal accidents in the control county fell from sixteen to three, fatal accidents in the checkpoint county actually doubled from the prior year.

The trial court also appropriately considered evidence presented on alternatives to checkpoints. In examining the extent to which the challenged seizure advances the public interest sought to be served, courts should examine the availability of alternative procedures which can be more properly used. *Prouse, supra,* p 655. The then sheriffs of Macomb County, Kalamazoo County, and Wayne County all testified as to other means used in their counties to combat drunk driving and as to their respective opinions that other methods currently in use, e.g., patrol cars, were more effective means of combating drunk driving and utilizing law enforcement resources than sobriety checkpoints. Once again, based on our review of the record, we do not believe the trial court clearly erred in finding that sobriety checkpoints were not an effective means of combating drunk driving.

C

Following the *Brown* analysis, the trial court

finally examined both the objective and subjective nature of the intrusion caused by sobriety checkpoints. Although the court found the objective intrusion, measured by the duration of the seizure and intensity of the investigation, to be minimal, the court found the subjective intrusion on individual liberty interests to be substantial.

In considering the degree of subjective intrusion, the court reviewed two factors as set forth in *Martinez-Fuerte, supra,* p 558: (1) the potential of the checkpoints to generate fear and surprise to motorists; and (2) the degree of discretion left to individual officers. While the court found that the guidelines established to implement the checkpoints minimized on-the-scene officers' discretion, the court concluded that the checkpoints had the potential to generate fear and surprise to motorists. The court was unpersuaded by defendants' contention that the level of surprise was minimized because motorists would be able to turn around prior to entering a checkpoint where the evidence showed the absence of any provision to alert the public to the option of turning around to avoid a checkpoint and the further absence of a provision ensuring that the checkpoints would be located where motorists could safely and legally make u-turns or turn-offs. The trial court did not clearly err in finding the potential for an unreasonable subjective intrusion on individual liberty interests.

D

The record discloses no basis for disturbing the trial court's factual findings. Moreover, such findings were made in the context of an examination under the legal standard adopted by the United States Supreme Court for determining the consti-

tutionality of seizures less intrusive than traditional arrests. In finding defendants' sobriety checkpoint plan to be violative of the Fourth Amendment of the United States Constitution, we fully recognize the genuine and serious drunk driving problem in Michigan and our state's interest in implementing methods designed to curb drunk driving. It is the duty of our courts to ensure, however, that governmental activities undertaken to promote the public interest satisfy constitutional standards. While the goals of the sobriety checkpoint program are laudable, the program fails to qualify as a reasonable seizure under the Fourth Amendment. Accordingly, we affirm the trial court's order enjoining defendants from implementing the program.

IV

The trial court also found defendants' sobriety checkpoint program violative of art 1, § 11 of the Michigan Constitution. Defendants contend that the court, in making its finding, concluded that art 1, § 11 offers greater protection than the Fourth Amendment to the federal constitution and that such a construction of the state constitutional provision is erroneous.

We find it unnecessary to consider this issue because art 1, § 11 offers at least the same protection as accorded by the Fourth Amendment and we have already found the checkpoint program to be an unreasonable seizure under the Fourth Amendment. Therefore, we affirm the trial court's finding that defendants' sobriety checkpoint program is an unreasonable seizure under art 1, § 11 of the Michigan Constitution.

Affirmed.