Oscar NIETO, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–92–134–CR.

Court of Appeals of Texas,
Corpus Christi.

June 30, 1993.

W.J. Sames, Corpus Christi, for appellant.

Carl Lewis, Walter Bryan, County Attorney's Office, Corpus Christi, for appellee.

Before KENNEDY, SEERDEN and FEDERICO G. HINOJOSA, JJ.

## OPINION

KENNEDY, Justice.

Oscar Nieto was convicted after a trial to the court of unlawfully carrying a weapon. The court sentenced him to 90 days in jail. By one point of error, Nieto asserts that the court erred in denying his motion to suppress because the search and seizure that uncovered the weapon violated the federal constitution. We reverse and remand.

According to the suppression hearing testimony and report of Nueces County Sheriff's Department deputy Robert Meza, the Bureau of Alcohol, Tobacco, and Firearms requested the assistance of the NCSD in apprehending some members of the Bandidos motorcycle club for whom arrest warrants had issued. The ATF told the NCSD that the Bandidos were holding a gathering in a particular subdivision. The ATF requested that the NCSD station uniformed officers in marked patrol units at the three main entrances to the subdivision.

Here Meza's suppression hearing testimony and report diverge. Meza's report states, "We were to stop 'only' any type of vehicles in which Bandidos were recognized wearing their colors (their Bandido jackets)." At the hearing, however, Meza testified, "At that point every individual that was coming into this particular subdivision was stopped and was checked."[1] Nieto testified at the hearing that some drivers were stopped but allowed to proceed into the subdivision without having their licenses checked; he speculated that these people resided in the area because they were not Bandidos. Meza denied that he let any car through without checking the driver's license.

Meza's testimony and report agree regarding the nature of his stop of Nieto. Meza stated that Nieto was wearing a Bandidos jacket. When Nieto reached for his wallet in response to Meza's request for his driver's license, Meza noticed a bulge in Nieto's left front waistline. Because of the nature of the bulge and because the ATF had told the NCSD that the Bandidos were armed and dangerous, Meza felt threatened and performed a patdown search. Meza discovered a handgun in Nieto's left front waistline, cartridges in his pockets, and marijuana in his jacket.[2]

Nieto denied that he was wearing his Bandidos jacket, testifying that it was under his seat because the day (April 30) was too warm. Nieto did not deny possessing the gun or the marijuana, but disputed the officer's testimony regarding the gun's location; Nieto testified that the gun was in his right rear pocket.

The court denied Nieto's motion to suppress the fruits of the patdown search. He claims that denial was erroneous. We agree.

The stop was clearly not authorized under traditional Fourth Amendment analysis.[3] Except at particular checkpoints (discussed below), in order to stop a car police must have specific articulable facts and rational inferences from those facts that create reasonable suspicion of wrongdoing by the car's occupants. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); *see also United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). In

---

1. At the trial, held three years after the suppression hearing and three-and-a-half years after the incident, Meza's testimony on this issue comported with his report.

2. Nieto's motion for instructed verdict on the marijuana charge was granted at trial because the State failed to produce the marijuana.

3. The State concedes that the checkpoint stop was a seizure under the Fourth Amendment.

*See Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *see also United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976). The State does not argue that the stop satisfies traditional Fourth Amendment analysis; a discussion of the wisdom of the State's decision is instructive on the issues at stake.

*Brignoni–Ponce,* Border Patrol officers sat at a closed, permanent false border checkpoint and watched traffic bound away from the border. They stopped a car because the three occupants appeared to be of Mexican descent. *Id.* 422 U.S. at 875, 95 S.Ct. at 2577. The officers said they stopped the car because the occupants' apparent Mexican descent made the officers believe the occupants might be (or be transporting) illegal aliens. The Court held the stop invalid because the occupants' appearance alone did not supply reasonable suspicion that the occupants were illegal aliens. *Id.* 422 U.S. at 885–86, 95 S.Ct. at 2582–83. Though the number of Bandido jacket-wearers is presumably smaller than the number of persons who appear to be of Mexican ancestry, enough persons wear Bandidos jackets to render unreasonable the stop (absent exigent circumstances not present here) of a jacket-wearer on the premise that jacket-wearers who are suspected felons may be in the area.

■ The requirement of reasonable suspicion persists in a post-crime investigation. *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). In *Hensley,* officers stopped a person whom they knew and whom they knew was the subject of a flyer or bulletin regarding a crime; the officers also knew that such flyers were generally precursors to arrest warrants. *Id.* 469 U.S. at 223–224, 105 S.Ct. at 677–678. The stop was not part of any checkpoint. The court held that a flyer based on reasonable suspicion justifies a stop of the flyer's subject to check identification, pose questions, or obtain further information. *Id.* 469 U.S. at 232, 105 S.Ct. at 682. Here, the person stopped was not the subject of the warrants nor was he misidentified as such beyond his alleged wearing of a Bandidos jacket.

Stops at fixed checkpoints are subject to a different analysis even if the checkpoints are temporary. The Supreme Court held the door open to temporary checkpoints while disallowing random, unrestricted spot checks for driver's licenses in *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391,

1401, 59 L.Ed.2d 660 (1979). The Court held that, in evaluating the constitutionality of such stops, courts must balance societal interest in preventing crime against the intrusion on individual rights. *Id.* 440 U.S. at 654, 99 S.Ct. at 1396. The Court has since allowed stops of all vehicles to check for intoxication (*Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)), and for driver's licenses (*See Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)), among other reasons. In *Sitz,* the Court found that the societal interest in catching and deterring drunk driving was furthered by the administratively promulgated checkpoint program, and that the program guidelines limited the duration of the stop and consequent intrusion on individual rights sufficiently to justify the program constitutionally. 496 U.S. at 451–455, 110 S.Ct. at 2485–88. In *Texas v. Brown,* the Court joined the Texas Court of Criminal Appeals in not questioning the validity of a stop that was part of a driver's license checkpoint. 460 U.S. at 739, 103 S.Ct. at 1542.

Texas courts have not blindly accepted all checkpoints posed as driver's license checkpoints. *Webb v. State,* 739 S.W.2d 802 (Tex.Crim.App.1987) (driver's license checkpoint set up near Dallas bars to find DWIs not constitutionally justified); *Meeks v. State,* 692 S.W.2d 504, 506 (Tex.Crim. App.1985) (statute allowing driver's license checkpoint did not authorize checkpoint set up to "enforce all the laws" such as vehicle weight limits, car theft, illegal aliens, fish and game regulations, or any other laws); *King v. State,* 816 S.W.2d 447 (Tex.App.— Dallas 1991, pet. ref'd) (post-*Sitz* case finding on remand that Dallas DWI checkpoint was unconstitutional because it was not grounded in a legislatively-developed administrative scheme like the one in Michigan in *Sitz* ).

■ To evaluate the validity of checkpoints, Texas courts apply the balancing test set out by the Supreme Court in *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979).[4] *State*

4. *Brown v. Texas,* cited here, is not the same case as *Texas v. Brown,* cited above.

*v. Sanchez,* 856 S.W.2d 166, 168 (Tex.Crim. App.1993). The balancing factors are state interest or public concern, the degree the checkpoint advances that interest or concern, and the severity of the interference with individual liberty. *Sanchez,* 856 S.W.2d at 168. In *Brown v. Texas,* the Court placed particular emphasis on the existence of a plan embodying explicit, neutral limitations on the conduct of individual officers. 443 U.S. at 51, 99 S.Ct. at 2640. In *Sitz,* the Court reaffirmed the validity of the balancing test, though it emphasized the weight we must give to administrative guidelines for checkpoints. *Sitz,* 496 U.S. at 450, 110 S.Ct. at 2485; *see also Sanchez,* at 168–70; *King,* 800 S.W.2d 528, 529 (Tex. Crim.App.1990).[5]

■ The public interest factors from *Brown v. Texas* must be modified to account for differences between the concerns raised by a quest for persons with outstanding arrest warrants and those raised by a quest for persons who are contemporaneously committing or planning to commit a crime. *See Hensley,* 469 U.S. at 228, 105 S.Ct. at 680. When an arrest warrant has issued, the subject crime is complete; therefore, the crime prevention, public safety, and exigence concerns that accompany pre-crime stops are generally reduced. *Id.* These factors are especially minimized on long-outstanding warrants. Police have a wider range of opportunity to choose the time and circumstances of their stop of such persons. *Id.* Nevertheless, allowing stops of persons with warrants whom police have been unable to locate furthers the interest in solving crimes and bringing offenders to justice. *Id.* 469 U.S. at 229, 105 S.Ct. at 680.

Though the public certainly has an interest in seeing that the subjects of arrest warrants are detained, this checkpoint did not properly effectuate that interest. The exigence for a checkpoint was minimal because there was no evidence presented that the wanted persons were contemporaneously committing crimes (including DWI, carrying expired driver's licenses, or not having proper insurance) or fleeing into this subdivision. The checkpoint's mission to find particular wanted Bandidos is better delineated than the *Meeks* checkpoint's vague, overly broad purpose to enforce all laws, but nevertheless lacked sufficient procedural definition. There is no evidence of clear guidelines for the checkpoint. The officer testified that he was told to stop everyone, but had written in his report that he was told to stop only Bandidos wearing their jackets. There is no evidence regarding procedures other than asking the driver for a driver's license.

The checkpoint falls short in the analysis of its effectiveness versus the intrusion on the populace. The intrusion appears to have been minimal, along the lines of the brief detentions in *Sitz* 496 U.S. 444, 110 S.Ct. 2481, and *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535.[6] If the officers stopped everyone entering the subdivision, though, they intruded into the privacy of more persons, including those who lived in the subdivision; if they stopped only Bandidos wearing jackets, they missed targeted individuals who did not wear their jackets that warm spring day. Regardless of which method the officer used to select cars to stop, he indicated only that he got the driver's license of the driver, which limited the checkpoint's effectiveness by ignoring passengers who might have been targeted individuals. There is no evidence that the officer had any information (other than names) about the wanted persons, such as descriptions or vehicle identification.

Most damning, however, is the absence of evidence that law enforcement officials knew that the subjects of the warrants would attend the picnic. This void reduces the public interest justification, increases the unnecessary intrusion, and undermines

---

5. On remand, this case was the *King v. State* cited above at 816 S.W.2d 447.

6. The fear factor of intrusion would be greater than in either of these cases if the court accepted Nieto's testimony that there were twenty obviously heavily-armed, uniformed officers standing around, rather than Meza's testimony that there were four uniformed officers. This factor alone would not be sufficient to invalidate the checkpoint.

the effectiveness of the checkpoint. The report and the testimony show that the government had warrants for some Bandidos and knew that a group of Bandidos were gathering at a particular subdivision, but neither shows any intersection of those sets. The only whiff of linkage came at the suppression hearing when, on recross-examination, Meza testified, "Like I said at the beginning, sir, we were there to assist this particular agency for person, especially the Bandidos, that were in that particular area; but we were supposed to check, you know, anyone that was coming into that particular area." The testimony regarding the success rate of the officer's checkpoint underlines the absence of this crucial link; though the officer stopped 20 cars, he arrested only Nieto, a person who was not on the wanted list.

We do not hold that every checkpoint must have legislative and administrative underpinnings as extensive as those in *Sitz*. *See* 496 U.S. at 447, 110 S.Ct. at 2483–84. That degree of decision-making by politically accountable officials is a factor weighing in favor of a checkpoint, and such consideration would help the officers avoid the lack of focus that undermined this checkpoint. We do, however, require some showing of guidance or authorization by superiors and some showing of established procedures for the checkpoint. *See Sanchez*, at 169–70. Absent more explicit guidelines for the checkpoint, more specific descriptions for the wanted persons than just their attire, and some reasonable indication that the wanted persons will attend, such seizures intrude too much into the privacy of individuals without a corresponding furthering of societal interest in fighting crime.

Because we have found the seizure of Nieto improper, the fruits of the subsequent search are tainted by a lack of consent to the search. *See Meeks*, 692 S.W.2d at 504. We sustain the point of error without further consideration.

We reverse and remand.