The STATE of Texas, Appellant,

v.

Juan Enrique SANCHEZ, Appellee.

No. 13–89–157–CR.

Court of Appeals of Texas,
Corpus Christi.

Nov. 15, 1990.

Rehearing Overruled Dec. 13, 1990.

Maria D. Nunez, Michael E. Sieber, Victoria, for appellant.

George J. Filley, Victoria, for appellee.

Before NYE, C.J., and DORSEY and SEERDEN, JJ.

## OPINION

NYE, Chief Justice.

The State indicted appellee, Juan Enrique Sanchez, for possessing between fifty and two-hundred pounds of marihuana. Appellee filed a pretrial motion to suppress the contraband, contending that state police officers had discovered it pursuant to an unlawful warrantless stop of his vehicle. The trial court granted the motion. The State appealed. We reverse the trial court's order suppressing the evidence and remand the case for trial.

The evidence shows that on or about April 30, 1987, four Texas Department of Public Safety troopers decided to install a temporary checkpoint at Loop 175 and Fox Road. The troopers established the checkpoint in order to inspect motorists' driver's licenses, insurance coverage, vehicle registration and outside vehicle equipment. On that day at approximately 8:30 a.m., the four troopers set up traffic cones and signs to designate the checkpoint's location. The signs said, "Driver's license check ahead". The troopers stopped all northbound vehicles. Appellee stopped his vehicle at this checkpoint. Trooper Flores requested appellee's driver's license and proof of insurance. Appellee informed Flores that he did not have "any insurance with him." Flores instructed appellee to pull his vehicle off of the road and step out. Flores asked appel-

lee if he could look into the vehicle's trunk. Appellee stated yes and opened the trunk. Flores and Trooper Perez looked into the trunk and saw three large camouflage bags inside. Flores detected the strong odor of what appeared to be marihuana. Appellee signed a consent to search form, indicating that he would allow the troopers to search the bags. The troopers opened the bags and discovered the marihuana.

Flores testified that when five or fewer troopers are involved in setting up this type of checkpoint, Department of Public Safety guidelines permit the troopers to decide amongst themselves the checkpoint's location and time. Trooper Perez testified that they had not decided how long the checkpoint would last, but he said that, generally, these checkpoints do not exceed one hour.

Either in his motion to suppress or argument at the suppression hearing, appellee contended that the checkpoint violated Texas statutory law or that the stop was illegal because it was suspicionless. The State argued in general that driver's license checkpoints are legal and that this particular stop was proper because it was conducted in accordance with Department of Public Safety guidelines.

The trial court found that "Trooper Flores, Perez, Wallace and Downs established a check point on U.S. Highway 59 North on their own initiative to check Driver's License, inspection stickers, insurance for Financial Proof of Responsibility, and visual check of automobile equipment." The trial court further found "that such a check point stop for the purpose of checking insurance coverage in addition to a Driver's License check is not authorized by law and is therefore an illegal stop...."

■ By a single point of error, the State complains that the trial court erred in sustaining appellee's motion to suppress. On appeal, the parties rely on constitutional and Texas statutory law to argue their conflicting positions. The State says that article 6701h, § 1B(a) provides that every owner and/or operator in the State of Texas shall be required as a condition of driving, to furnish, upon request, evidence of financial responsibility to a law enforcement officer of the State of Texas or any subdivision thereof. The State argues that this statute allows law enforcement officers to request proof of financial responsibility at a checkpoint.

On the other hand, appellee contends that since a driver's license check was not the *sole* reason for his detention, his detention is illegal under *Meeks v. State*, 692 S.W.2d 504 (Tex.Crim.App.1985). In *Meeks*, officers established a roadblock for the purpose of "enforcing all the laws." In particular, the officers checked for driver's licenses, equipment, overweight vehicles, fugitives, stolen vehicles, sobriety, controlled substances, game violations, and illegal immigrants. The State sought to justify the roadblock under Tex.Rev.Civ.Stat. Ann. art. 6687b, § 13 which states, in pertinent part, that "any peace officer may stop and detain any motor vehicle operator for the purpose of determining whether such person has a driver's license as required by this section." Using an analysis akin to a pretext theory, the court found that article 6687b did not justify the initial stop of Meeks' vehicle. The court stated that article 6687b, § 13 does not authorize a detention unless the license check was the *sole* reason for the stop. That a stopped driver was first asked for his license will not validate the stop under the statute if it is clear the driver's license check was not the reason for the detention. By so interpreting article 6687b, the *Meeks* Court resolved the legality of the checkpoint on a statutory basis.

Since Meeks' 1977 stop, Texas law has changed. Beginning January 1, 1982, Texas law has required every operator, as a condition of driving, to furnish, *upon request*, evidence of financial responsibility to law enforcement officers. *Meeks* must be limited to its factual setting, i.e., the facts showed that the officers were stopping vehicles for what amounted to a "fishing expedition." Given the factual and legal distinctions, *Meeks* does not control the present case.

Article 6701h does not explicitly authorize or prohibit the stop of a vehicle to

determine compliance with the financial responsibility requirement. It would make no sense to now hold that a driver could be stopped for a license check but that the officer could not validly request proof of financial responsibility at the same time. Since neither article 6687b, nor article 6701h, nor any other statute prohibits an officer who has stopped a vehicle for a license check from requesting proof of financial responsibility, we find that Texas *statutes* do not, as such, prohibit an insurance check in combination with a lawful license check.

■ Article one, section nine of the Texas Constitution and the Fourth Amendment of the U.S. Constitution are the same in all material respects. *Brown v. State*, 657 S.W.2d 797, 799 (Tex.Crim.App.1983); *see Gearing v. State*, 685 S.W.2d 326, 329 (Tex. Crim.App.1985). Therefore, United States Supreme Court cases are applicable to the instant case.

■ Temporary checkpoint stops are "seizures" under the Fourth Amendment. *Michigan Department of State Police v. Sitz*, — U.S. —, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990); *United States v. Martinez–Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976). The Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989); *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). Whether a search is reasonable "depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985). The Fourth Amendment imposes limits on search and seizure powers in order to prevent law enforcement officials from arbitrary and oppressive interference with an individuals' privacy and personal security. *Martinez–Fuerte*, 428 U.S. at 555, 96 S.Ct. at 3081. Thus, the permissibility of a particular law enforcement practice "is judged

by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).

■ A person, upon entering an automobile, does not surrender all Fourth Amendment protections. *New York v. Class*, 475 U.S. 106, 112, 106 S.Ct. 960, 965, 89 L.Ed.2d 81 (1986). Nevertheless, the State's intrusion into a particular area whether in an automobile or elsewhere cannot result in a Fourth Amendment violation unless the area is one containing a "constitutionally protected reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967).

■ The United States Supreme Court has recognized that an automobile's characteristics and use result in a lessened expectation of privacy therein:

> One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view.

*Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974). Moreover, automobiles are the subject of pervasive State regulation. Every motor vehicle operator must expect that the State, in enforcing its regulations, will intrude to some extent upon that operator's privacy:

> Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.

*South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976).

The U.S. Supreme Court has stated that the constitutional limits upon federal officers making vehicle stops are not necessarily applicable to local officers responsible for enforcing laws relating to drivers' licenses, safety requirements, weight limits and related matters. In *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), the issue was whether the Border Patrol could conduct vehicle searches at traffic checkpoints. *Ortiz,* 422 U.S. at 892, 95 S.Ct. at 2586. The Court held that at traffic checkpoints removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause. *Ortiz,* 422 U.S. at 896–97, 95 S.Ct. at 2588–89. The Court said that "we [do not] suggest that probable cause would be required for all inspections of private motor vehicles. It is quite possible, for example, that different considerations would apply to routine safety inspections required as a condition of road use." *Ortiz,* 422 U.S. at 898 n. 3, 95 S.Ct. at 2589 n. 3.

In *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the issue was whether a roving patrol of the Border Patrol may stop a vehicle near the Mexican border and question its occupants about their citizenship and immigration status when the only ground for suspicion is that the occupants appear to be of Mexican ancestry. *Brignoni–Ponce,* 422 U.S. at 874–75, 95 S.Ct. at 2574–77. The Court held that Border Patrol officers must have a reasonable suspicion to justify roving patrol stops. *Brignoni–Ponce,* 422 U.S. at 882, 95 S.Ct. at 2580. The Court (emphasis ours) pointed out:

> Border Patrol agents have no part in enforcing laws that regulate highway use, and their activities have nothing to do with an inquiry whether motorists and their vehicles are entitled, by virtue of compliance with laws governing highway usage, to be upon the public highways. *Our decision thus does not imply that state and local enforcement agencies are without power to conduct such lim-*
> *ited stops as are necessary to enforce laws regarding drivers' licenses, vehicle registration, truck weights, and similar matters.*

*Brignoni–Ponce,* 422 U.S. at 883 n. 8, 95 S.Ct. at 2581 n. 8.

In *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), federal officers arrested defendants at permanent checkpoints established to check vehicles for illegal aliens. *Martinez–Fuerte,* 428 U.S. at 545, 96 S.Ct. at 3077. The Court held that the stops and questioning at issue may be made in the absence of any individualized suspicion at reasonably located checkpoints. *Martinez–Fuerte,* 428 U.S. at 559, 96 S.Ct. at 3083. The Court based its holding on the grounds that interference with legitimate traffic is minimal, and checkpoint operations both appear to and actually involve less discretionary enforcement activity than roving patrols. *Martinez–Fuerte,* 428 U.S. at 559, 96 S.Ct. at 3083. The Court also stated that:

> Stops for questioning, not dissimilar to those involved here, are used widely at state and local levels to enforce laws regarding drivers' licenses, safety requirements, weight limits, and similar matters. The fact that the purpose of such laws is said to be administrative is of limited relevance in weighing their intrusiveness on one's right to travel; and the logic of the defendants' position, if realistically pursued, might prevent enforcement officials from stopping motorists for questioning on these matters in the absence of reasonable suspicion that a law was being violated. As such laws are not before us, we intimate no view respecting them other than to note that this practice of stopping automobiles briefly for questioning has a long history evidencing its utility and is accepted by motorists as incident to highway use.

*Martinez–Fuerte,* 428 U.S. at 561 n. 14, 96 S.Ct. at 3084 n. 14.

The United States Supreme Court has indicated that one "possible" way for the State to enforce laws regarding driver's licenses, safety requirements and similar

matters would be to question all on-coming traffic at a roadblock. In *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), a State police officer stopped a vehicle and seized marihuana. This stop occurred at random and did not occur at a checkpoint. During the suppression hearing, the officer testified that he stopped the vehicle in order to check the driver's license and registration. The officer was not acting pursuant to any standards, guidelines, or procedures pertaining to document spot checks. *Prouse*, 440 U.S. at 650, 99 S.Ct. at 1394.

The Court held that absent an articulable, reasonable suspicion of unlawful conduct, a motorist may not be subjected to a random license check. The Court stated that their holding *does not* prevent a state from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. The Court said that "[q]uestioning of all on-coming traffic at roadblock-type stops is one possible alternative." *Prouse*, 440 U.S. at 663, 99 S.Ct. at 1401. Furthermore, the Court said that their holding did not "cast doubt on the permissibility of roadside truck weigh-stations and inspection checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection than are others." *Prouse*, 440 U.S. at 663 n. 26, 99 S.Ct. at 1401 n. 26.

The United States Supreme Court authorized brief detentions of motor vehicles at temporary checkpoints in *Michigan Department of State Police v. Sitz*, —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In *Sitz*, the Michigan Department of State Police and its director established a sobriety checkpoint program. *Sitz*, 110 S.Ct. at 2483. The director appointed an advisory committee which created guidelines setting forth procedures governing checkpoint operations. *Sitz*, 110 S.Ct. at 2484.

Following these guidelines, checkpoints would be set·up at selected sites along highways. All vehicles passing through a checkpoint would be stopped and their drivers briefly examined for intoxication symp-toms. If intoxication symptoms were detected, the motorist would be directed to a location out of the traffic flow where an officer would check the motorist's *driver's license and car registration* and, if warranted, conduct further sobriety tests. *Sitz*, 110 S.Ct. at 2484.

The United States Supreme Court determined that the severity of the drunken driving problem and the States' interest in controlling it outweighs the "slight" intrusion on motorists stopped briefly at sobriety checkpoints. *Sitz*, 110 S.Ct. at 2485–86. The Supreme Court stated that these checkpoints were to be selected pursuant to the guidelines, and uniformed police officers stop every approaching vehicle. The intrusion resulting from the brief stop at the checkpoint is for constitutional purposes indistinguishable from the checkpoint stops upheld in *Martinez–Fuerte*. Moreover, the Court said that the Michigan Court of Appeals erred when it considered the "effectiveness" of the proposed checkpoint program. The Court stated that "politically accountable officials" and not "the courts" should determine "which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Sitz*, 110 S.Ct. at 2487.

■ Considering the instant case, four Department of Public Safety officers established a temporary checkpoint and stopped every northbound vehicle to inspect motorists' driver's licenses, vehicle registration, insurance coverage and outside vehicle equipment. The checkpoint was authorized in accordance with Department of Public Safety guidelines. Once the vehicles were stopped, the officers identified themselves and requested to see the driver's license and proof of insurance. The U.S. Supreme Court does not require the State to present any evidence concerning the effectiveness of a temporary checkpoint. Furthermore, the U.S. Supreme Court never said that the State had to establish guidelines concerning the checkpoint's time, frequency or location.

There is virtually no difference between the levels of intrusion on law-abiding mo-

torists from the brief stops occurring in the U.S. Supreme Court cases of *Martinez–Fuerte* and *Sitz* and the stop involved in this case. The intrusion resulting from the brief stop is for constitutional purposes indistinguishable from the checkpoint stops upheld in *Martinez–Fuerte* and *Sitz*. The State's point of error is sustained.

■ Appellee contends in a motion which we carried with the case and in his appellate brief that this court lacks jurisdiction to consider this appeal. He complains that an assistant district attorney, and not the district attorney, signed the State's notice of appeal.

Tex.Code Crim.Proc.Ann. art. 44.01 (Vernon Supp.1990) states, in pertinent part:

(a) The state is entitled to appeal an order of a court in a criminal case if the order:

(1) dismisses an indictment, information, or complaint or any portion of an indictment, information, or complaint;

. . . . .

(d) The prosecuting attorney may not make an appeal under ... this article later than the 15th day after the date on which the order, ruling, or sentence to be appealed is entered by the court.

. . . . .

(i) In this article, "prosecuting attorney" means the county attorney, district attorney, or criminal district attorney who has the primary responsibility of prosecuting cases in the court hearing the case and does not include an assistant prosecuting attorney.

In this case, the State had to file its notice of appeal by April 20, 1989. On April 7, 1989, the district court file-stamped the State's notice of appeal. This notice states, in pertinent part: "Comes now the State of Texas by and through George J. Filley, III Criminal District Attorney of Victoria County, and files this Notice of Appeal pursuant to Article 44.01(a)(5), Texas Code of Criminal Procedure...." The Hon. Michael M. Kelly, assistant criminal district attorney, signed this notice of appeal.

By letter dated April 27, 1989, this court notified George J. Filley, criminal district attorney, that the notice of appeal was defective because an assistant district attorney signed and filed it. In response, the State, on May 3, 1989, filed an amended second notice of appeal which Filley signed. Appellee filed a motion to dismiss the appeal, arguing that the time for filing notice of appeal had expired before the valid notice of appeal, which Filley signed, was filed.

In *State v. Barker*, 780 S.W.2d 927, 928 (Tex.App.—Austin 1989, pet. ref'd), the defendant argued that subsection (i) of article 44.01, when read together with subsection (d), requires that an appeal under subsection (a) must be taken by and through the county, district, or criminal district attorney, as distinct from an assistant prosecuting attorney. In *Barker*, the State's notice of appeal read, in pertinent part: "COMES NOW the State of Texas, by and through the Travis County Attorney, and within 15 days of the trial court's order dismissing the State's complaint and information files this notice of appeal from such pretrial order...."

The appellate court held that because the notice of appeal recites that the State is acting "by and through the Travis County Attorney", this is sufficient to comply with article 44.01(i), *even though the county attorney did not sign the notice of appeal*. The appellate court noted that after the defendant's motion to dismiss was filed, the State promptly filed an amended notice of appeal which the county attorney signed. This corrected the defect, *if any*, in the original notice of appeal. *Barker*, 780 S.W.2d at 928.

In *State v. Muller*, 798 S.W.2d 315 (Tex. App.—Houston [1st Dist.] 1990), the State appealed a trial court's order striking a paragraph in an information. *Muller*, 798 S.W.2d at 317. The State's notice of appeal, filed within the proper period, states, in pertinent part: "Now comes the State of Texas, by and through its District Attorney, John B. Holmes, Jr., pursuant to Tex. Code Crim.Proc. art. 44.01(a)(1) and (a)(5)...." An assistant district attorney

signed this notice. *Muller*, 798 S.W.2d at 317.

The defendant claimed the appellate court did not have jurisdiction of the State's appeal because an assistant district attorney, and not the district attorney, signed the notice of appeal. *Muller*, 798 S.W.2d at 318. The appellate court held that article 44.01 does not require the prosecuting attorney to personally sign the notice of appeal. *Muller*, 798 S.W.2d at 318. The appellate court stated that even though Holmes, as district attorney, did not sign the notice of appeal, an assistant district attorney signed his name for him. *Muller*, 798 S.W.2d at 318.

 In the instant case, the notice of appeal which Kelly signed and filed says that the State is acting "by and through George J. Filley, III Criminal District Attorney." This is sufficient to be in compliance with the statute, even though George J. Filley, III, the criminal district attorney, did not originally and actually sign the notice of appeal. Article 44.01 does not specifically state that an assistant prosecuting attorney cannot sign and file a notice of appeal on behalf of the county, district, or criminal district attorney. Furthermore in this case, like in *Barker*, after this court notified the State that its original notice of appeal did not comply with article 44.01(i), the State promptly filed a notice of appeal which Filley signed. This corrected the defect, even if one existed in the original notice of appeal. *See Barker*, 780 S.W.2d at 928; Tex.R.App.P. 83.[1]

We OVERRULE the trial court's order suppressing the evidence and REMAND the case for trial.

DORSEY, Justice, dissenting.

I respectfully dissent to the majority's conclusion that the checkpoint was proper. I perceive the issue to be whether officers acting without supervisory approval or control may create a roadblock stopping all traffic to inspect driver's licenses, insurance, vehicle registration, and equipment. The determinative question is whether individual law enforcement officers have such unbridled discretion without reasonable suspicion or probable cause that a crime has been or will be committed.

Vehicle stops at checkpoints constitute seizures within the meaning of the Fourth Amendment of the United States Constitution. *Michigan Dept. of State Police v. Sitz*, —— U.S. ——, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990). Article I, Section 9, of the Texas Constitution and the Fourth Amendment of the Federal Constitution are the same in all material aspects. *Brown v. State*, 657 S.W.2d 797, 799 (Tex.Crim.App. 1983); *see also Gearing v. State*, 685 S.W.2d 326, 329 (Tex.Crim.App.1985). Thus, an analysis of the stop under Fourth Amendment principles is dispositive. For that analysis, the fundamental guides are decisions of the United States Supreme Court in similar checkpoint or vehicle stop cases.

The Fourth Amendment protects the rights of citizens to be secure from unreasonable searches and seizures. The reasonableness of seizures that are less intrusive than an arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law enforcement officers. *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). Also to be considered is the degree to which the seizure advances the public interest. *Brown*, 443 U.S. at 51, 99 S.Ct. at 2640.

In *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court struck down a random stop by a patrolman to check driver's licenses, registrations, and equipment. *Prouse*, 440 U.S. at 648, 99 S.Ct. at 1391. The patrolman was directed by policy to stop any vehicles he chose during those periods he was not per-

---

**1.** Rule 83 provides, in pertinent part:
 A judgment shall not be affirmed or reversed or an appeal dismissed for defects or irregularities, in appellate procedure, either of form or substance, without allowing a reasonable time to correct or amend such defects or irregularities provided the court may make no enlargement of the time for filing the transcript and statement of facts....

forming other duties. The stops were to be completely random and left to the discretion of the patrolman. The justification by Delaware for the stops was to insure that only licensed drivers in properly registered and equipped vehicles were on the highways. In weighing the reasonableness of those aims with the seizing of drivers, much of what the court said in disapproving the stop in *Prouse* is applicable here:

> In terms of actually discovering unlicensed drivers or deterring them from driving, the spot check does not appear sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment. *Id.* It does not appear, therefore, that a stop of a Delaware-registered vehicle is necessary in order to ascertain compliance with the State's registration requirements. *Id.*

The Court concluded that "the marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure— limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable—at the unbridled discretion of law enforcement officials." *Prouse,* 440 U.S. at 659–661, 99 S.Ct. at 1399–1400. In *Prouse,* then, the State's interest in keeping unlicensed drivers and faulty or unregistered vehicles off the road did not justify enabling an officer to stop whatever vehicle he chose without reasonable suspicion or probable cause.

The United States Supreme Court recently upheld the use of a roadblock to locate and identify drunken drivers. *Sitz,* 110 S.Ct. at 2481. The State of Michigan, acting through its state police at the highest levels, determined that a roadblock would be an effective tool to reduce the carnage caused by drunken drivers. The decision to use a roadblock to accomplish those salutary aims, its location and time of operation, and personnel and equipment involved was determined by accountable supervisory officials. The balancing of the potential effectiveness of a roadblock, the public interest to be served with the intrusiveness of the stop was done at the highest levels of the department. The Supreme Court approved the use of the roadblock finding it was less intrusive than being stopped by an individual patrolman with overhead lights flashing and the decision to employ a roadblock as well as the details of its operation were determined by politically responsible officials, who are positioned to balance the intrusiveness of the seizure against the benefits to be achieved.

As Chief Justice Burger wrote for the majority in *Brown:* "The central question in balancing these competing considerations [gravity of public concern, degree seizure advances the public interest, and the severity of the interference with individual liberty] in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown,* 443 U.S. at 51, 99 S.Ct. at 2640.

The majority here argues that the officers who established the roadblock and stopped Sanchez were acting according to departmental policy, and thus their activities are analogous to the roadblock in *Sitz* being authorized at the highest levels of the state police. I strongly disagree. In *Sitz,* politically accountable officials balanced the harm of the intrusiveness of the seizure with the goals of ridding the road of drunk drivers. Here the guidelines that governed the officers, conduct were that they needed no approval from the department if six or less officers operated a roadblock. There is no evidence of department policy governing the establishment of checkpoints or roadblocks; the only evidence is that no supervisory approval was necessary if the number of officers involved was minimal. This places all decisions regarding the wisdom of the roadblock and the balancing of individual liberty against the goals of public safety solely "at the unfettered discretion of the officers in the field," as long as the officers involved numbered less than six. Even though the intrusion into personal liberty is small in this situation, it remains a "seizure" of a person under Fourth Amendment teachings. The reasonableness of the seizure of all motorists who happen to be

where the roadblock is created should not be determined solely by the officers conducting the roadblock.

I would hold the trial judge ruled correctly in finding the roadblock illegal and suppressing the evidence seized there. I respectfully dissent.