The STATE of Texas, Appellant,

v.

Juan Enrique SANCHEZ, Appellee.

No. 168–91.

Court of Criminal Appeals of Texas, En Banc.

June 23, 1993.

Maria D. Nunez, Michael E. Sieber, Victoria, for appellee.

George J. Filley, III, Dist. Atty., and Michael M. Kelly, Asst. Dist. Atty., Victoria, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW

MALONEY, Judge.

Appellee was indicted for unlawful possession of marijuana. Appellee filed a motion to suppress evidence seized during a Texas Department of Public Safety (DPS) automobile roadblock stop. The trial court granted appellee's motion, finding "that such a checkpoint stop for the purpose of checking insurance coverage in addition to a Driver's License check is not authorized by law and is therefore an illegal stop...." The State appealed.[1] The Thirteenth Court of Appeals reversed. *State v. Sanchez,* 800 S.W.2d 292 (Tex.App.—Corpus Christi 1990). We granted appellee's petition for discretionary review to determine whether "the Court of Appeals erred in reversing the trial court's order to suppress the evidence seized as a result of an unlawful warrantless stop of [appellee's] vehicle."

On the morning of April 30, 1987, four DPS officers set up a roadblock checkpoint in Victoria County without the authorization of a superior officer.[2] The evidence established that all northbound traffic was stopped for questioning concerning driver's licenses and insurance, and vehicles were visually inspected for equipment violations. Appellee arrived at the roadblock and, after brief questioning, officers discovered between 50 and 200 pounds of marijuana in the trunk of appellee's vehicle.[3] Appellee's motion to suppress sought to have the evidence of the marijuana suppressed as the fruit of an allegedly illegal search.

The Thirteenth Court of Appeals, noting that such a roadblock was not prohibited by Texas statutes and finding the level of intrusion produced by the roadblock indistinguishable from the intrusion arising from the stops at issue in *United States v.*

---

1. We note that the last entry in the record is the granting of appellee's motion to suppress and the State's appeal.

2. One of the officers testified that authorization is only required when six or more officers are involved in the roadblock.

3. We need not discuss the particular facts leading to the discovery of the marijuana in appellee's trunk as they do not bear on the propriety of the roadblock stop, at issue here.

*Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) and *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), held that the subject roadblock was reasonable under the Fourth Amendment to the United States Constitution. We will reverse.

■ The stopping of a vehicle constitutes a "seizure" for Fourth Amendment purposes. *Martinez–Fuerte*, 428 U.S. at 556–58, 96 S.Ct. at 3082–83; *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). The Fourth Amendment does not prohibit all seizures, but only those that are unreasonable. A "suspicionless search"[4] is deemed reasonable under the Fourth Amendment when it has met the balancing test set forth in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). *Brown* requires that the public interest be balanced against the individual's right to personal security in light of three factors: (1) the state interest involved, (2) the level of intrusion on the individual's privacy, and (3) effectiveness of the procedure used in achieving its stated goal. *Brown*, 443 U.S. at 50–51, 99 S.Ct. at 2640. We hold that the court of appeals erred in finding the subject roadblock reasonable under the *Brown* balancing test.

The United States Supreme Court has applied the *Brown* balancing test to determine the constitutionality of a sobriety checkpoint program established by a state police department. *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In *Sitz*, the Michigan Department of State Police and its Director established a pilot sobriety checkpoint program pursuant to governmental authority.[5] An advisory committee, comprised of members from the state police force, local police forces, state prosecutors, and the University of Michigan Transportation Research Institute, set forth the guidelines governing checkpoint operations, site selection and publicity. *Id.* 110 S.Ct. at 2484. The first checkpoint operated under the program was conducted with the cooperation of a county sheriff's department. The checkpoint was operated for one hour and fifteen minutes before its operations were suspended pending the outcome of litigation challenging its constitutionality. During the period of operation, 126 vehicles passed through the checkpoint. The average delay per vehicle was 25 seconds. Of three drivers detained for sobriety testing, two were arrested. *Id.* The Michigan state courts concluded that the checkpoint violated the Fourth Amendment. Applying the *Brown* balancing test, the United States Supreme Court reversed. The Court recognized that the state interest involved in addressing the DWI problem was great, citing statistics demonstrating the extent of alcohol-related accidents. *Id.* 110 S.Ct. at 2485–85. Addressing the level of intrusion on individual motorists, the Court said

**4.** A roadblock search falls into the category of a "suspicionless search". *Martinez–Fuerte*, 428 U.S. at 561–62, 96 S.Ct. at 3084–85. A "suspicionless search" is a search conducted in the absence of a warrant and without probable cause or reasonable suspicion. These types of searches originated as an administrative or regulatory necessity, such as building inspections where premises are inspected in the absence of any indicia of violations.

**5.** The Michigan court of appeals detailed the events leading to the implementation of the program:

1982 P.A. 310 established the Michigan Drunk Driving Task Force in the Department of State Police, M.C.L. § 257.625j; M.S.A. § 9.9325 (10). The Task Force was charged with reviewing all aspects of the drunk driving problem in the state. In September, 1985,

the Task Force submitted its final report which set forth thirty-five recommendations for combatting alcohol-related traffic accidents. One suggestion was the implementation of sobriety checkpoints on public highways. Due to legislative opposition, defendants did not attempt to implement sobriety checkpoints at that time.

In his State of the State Address on January 29, 1986, Governor Blanchard directed defendants to implement a sobriety checkpoint pilot program. In February, 1986, defendant Gerald L. Hough, Director of the Michigan Department of State Police, appointed a Sobriety Checkpoint Advisory Committee ... [which] drafted guidelines for the program. *Sitz v. Department of State Police*, 170 Mich.App. 433, 429 N.W.2d 180, 181 (Mich.Ct.App.1988).

[The] checkpoints are selected pursuant to the guidelines, and uniformed police officers stop every approaching vehicle. The intrusion resulting from the brief stop at the sobriety checkpoint is for constitutional purposes indistinguishable from the checkpoint stops we upheld in *Martinez–Fuerte* [, United States Border Patrol checkpoints].

*Id.* 110 S.Ct. at 2487. In light of the fact that 1.5 percent of the drivers passing through the checkpoint at issue were arrested for alcohol impairment, the Court concluded that the checkpoint's effectiveness in meeting its goals was sufficiently established. The Court held that "the balance of the State's interest in preventing drunken driving, the extent to which this system can be reasonably said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program." *Id.* 110 S.Ct. at 2488.

In reaching its decision in *Sitz*, the Supreme Court contrasted the sobriety checkpoint at issue there with the random roving-patrol stop at issue in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *Prouse*, a Delaware Highway Patrol officer was not acting pursuant to departmental procedures or guidelines and had not observed traffic violations or suspicious acts prior to stopping the vehicle. *Prouse*, 440 U.S. at 650–51, 99 S.Ct. at 1394–95. Concluding that this suspicionless stop was unconstitutional, the Court stressed both the lack of objective standards governing the officer's exercise of discretion and the absence of empirical evidence establishing the stop's effectiveness in promoting highway safety. The Court stated that:

This kind of standardless and unconstrained discretion is the evil the court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.

*Prouse*, 440 U.S. at 661, 99 S.Ct. at 1400. Any incremental increase in highway safety produced by such a random stop was insufficient to justify the intrusion on an individual's privacy. *Id.* at 659, 99 S.Ct. at 1399.

The *Sitz* Court also referred to its decision in *Martinez–Fuerte*, where the Court had addressed the constitutionality of permanent United States Border Patrol checkpoints established at various locations near the United States—Mexico border for the purpose of detecting illegal aliens. Similar to the establishment of the checkpoint at issue in *Sitz*, the locations of the checkpoints at issue in *Martinez–Fuerte* were selected by Border Patrol supervisory officials upon consideration of stated objective factors and were operated pursuant to standard Border Patrol procedures. Further, the effectiveness of the border checkpoints was demonstrated with empirical evidence. *Martinez–Fuerte*, 428 U.S. at 554, 96 S.Ct. at 3081. Based upon the use of standardized procedures and the evidence demonstrating the checkpoints' effectiveness in achieving the stated goals, the Supreme Court upheld the border checkpoints as constitutional.

In contrast to the checkpoints at issue in *Sitz*, which were established by the State Department of Police pursuant to guidelines set forth by an advisory committee appointed by the State Department of Police and the checkpoints at issue in *Martinez–Fuerte*, which were established and operated by the United States Border Patrol, the roadblock at issue in the instant case was established by four individual Department of Public Safety officers. In further contrast to the stops at issue in *Martinez–Fuerte* and *Sitz*, the record in the instant case is void of any showing that the DPS officers followed standardized guidelines in operating the subject roadblock. Rather, the participating officers acted without the authorization or guidance of a superior officer and without established procedures concerning the location of the roadblock or its operation.[6] In addition,

6. We note that while the checkpoint at issue in *Sitz* was established by a state-wide law enforcement agency pursuant to a directive from the governor, and the checkpoints at issue in *Martinez–Fuerte* were established by a national authority, the Supreme Court has not specifically

the State offered *no* evidence demonstrating the effectiveness of the roadblock in identifying violators. In both *Martinez–Fuerte* and *Sitz*, the effectiveness of the respective roadblocks was demonstrated with empirical evidence. The evidence in *Martinez–Fuerte* revealed that the ratio of illegal aliens detected to vehicles stopped was approximately .5 percent. In *Sitz*, approximately 1.5 percent of the drivers passing through the checkpoint were arrested for DWI. Although these figures are not overwhelming, the Supreme Court has stressed the importance of *some* empirical evidence to establish the effectiveness of the stop in achieving its stated goals.[7] Our search of the record reveals that there is no evidence establishing the effectiveness of the roadblock at issue in the record of 100 plus pages from the hearing on appellee's motion to suppress.[8]

■ In the absence of evidence of authoritatively standardized procedures followed in operating the subject roadblock in order to serve its stated purpose and minimize the officers' discretion, and in the absence of testimony or empirical evidence demonstrating the effectiveness of the roadblock, we hold the court of appeals erred in concluding that the roadblock was reasonable under the Fourth Amendment.[9] *See Sitz; Brown; Van Natta.*

addressed the issue of whether checkpoints implemented by county or local law enforcement agencies would be acceptable.

7.  Texas courts have also stressed the importance of some proof of effectiveness. In *State v. Van Natta,* the Fort Worth Court of Appeals held that the Supreme Court's holding in *Sitz* did not automatically validate all DWI roadblocks and emphasized the need for a showing of the roadblock's effectiveness in achieving its stated purpose:

    We are not called upon to judge the effectiveness of the technique ... since the State failed to make even a prima facie showing that the roadblock ... had any effect whatsoever in advancing the State's interest.

    *State v. Van Natta,* 805 S.W.2d 40, 42 (Tex. App.—Fort Worth 1991). The court held that the State failed to satisfy the effectiveness prong of *Brown* as approved in *Sitz. Id.* at 42.

8.  The only testimony that could possibly be said to bear on the issue of effectiveness was elicited by appellee, as follows:

The judgment of the court of appeals is reversed and this cause is remanded to the trial court.

McCORMICK, P.J., and MILLER and WHITE, JJ., dissent.

CAMPBELL, Judge, concurring.

The question presented in this case is whether the State's initial seizure of appellee Juan Enrique Sanchez at a Department of Public Safety highway checkpoint was "reasonable" within the meaning of the Fourth Amendment to the United States Constitution. Because the opinion of the plurality reaches the correct result but only after an incomplete and partially-incorrect analysis, I concur only in the judgment of the Court.

**The Facts**

The relevant facts are not in dispute. At approximately 8:45 a.m. on April 30, 1987, four Department of Public Safety (D.P.S.) troopers, acting on their own initiative, set up a temporary checkpoint on U.S. Highway 59 in Victoria County. The uniformed troopers briefly stopped all northbound traffic at the checkpoint for the purpose of inspecting each motorists' driver's license, proof of automobile liability insurance, vehicle registration, and external vehicle equipment. *See* Tex.Rev.Civ.Stat. art.

Q: [Defense counsel] Were any citations issued during that time [between when the roadblock was set up and Appellee's arrest]?
A: [DPS Officer] Yes, Ma'am.
Q: Do you recall what they were for?
A: No, Ma'am.

9.  We note that in addressing the third prong of the *Brown* balancing test, the court of appeals stated that the Supreme Court in *Sitz* held that no showing of effectiveness was necessary. The court of appeals misreads the case. *Sitz* held that it was for "politically accountable officials" and not "the courts" to determine "which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Sitz*, 110 S.Ct. at 2487. It did not condone a complete absence of a showing of effectiveness; but merely held that it was not the responsibility of the courts to choose among law enforcement alternatives. As stated above, there was empirical evidence establishing the effectiveness of the roadblock in *Sitz*, thus satisfying the third prong of *Brown*.

6687b, § 13 (driver's license statute), and art. 6701h, § 1B(a) (automobile liability insurance statute). The checkpoint's location, on a straightaway portion of the divided highway, was selected by the troopers for its safety and convenience. In addition, to enhance safety and allay motorists' concerns, the troopers placed traffic cones, orange flags, and signs on the highway instructing motorists that they were approaching an official checkpoint. The signs stated, "Driver's License Check Ahead."

At approximately 9:00 a.m., appellee stopped at the checkpoint in a two-door, 1977 Buick automobile. He was asked by one of the troopers to present his driver's license and proof of insurance. He produced his driver's license as requested but stated that he had no proof of insurance with him. At the same time, the trooper noticed that the passenger door window of appellee's vehicle was broken out and that "most of the glass was on the inside," indicating a possible break-in of the vehicle. The trooper also noticed that the front license plate of the vehicle was held in place by a wire, indicating that the plate possibly "did not belong on that vehicle." Because appellee had no proof of insurance, and because of the trooper's suspicions regarding appellee's vehicle, the trooper instructed appellee to drive his vehicle onto the shoulder and then to step out. Appellee did so.

After a quick radio check of D.P.S. records revealed that the license plates on appellee's vehicle actually belonged on a 1964 Ford automobile registered to one Ysabio Ramos of San Benito, the trooper asked appellee whether he would allow the trooper to inspect the vehicle's trunk. Appellee consented orally to the inspection and opened the trunk. Inside the trunk were three large bags, which emitted a "strong odor" of marihuana. The trooper then asked appellee to sign a consent form authorizing a search of the bags, and appellee did so. The trooper searched the bags, found approximately 85 pounds of marihuana, and arrested appellee.

On May 8, 1987, the grand jury of Victoria County indicted appellee for felony possession of marihuana. Appellee later filed a motion to suppress the marihuana on the ground that the D.P.S. checkpoint stop violated his rights to privacy and personal security under the Fourth Amendment. Appellee argued that the initial stop of his automobile was unreasonable under the Fourth Amendment because the four D.P.S. troopers conducting the checkpoint acted without "formal, neutral guidelines" regarding the establishment and operation of checkpoints. Appellee also complained that the stop was unreasonable because the troopers acted without "superior officers' knowledge, consent, or direction." Significantly, appellee did not contend that the checkpoint stop was unreasonable for any other reason, e.g., because it was unduly lengthy or was conducted at a particularly inconvenient time or place or in an unsafe or frightening manner.

The State argued in response that the checkpoint stop was reasonable under the Fourth Amendment because (1) such checkpoints are the only effective law enforcement tools for detecting violations of the driver's license and automobile liability insurance statutes, and (2) the troopers' discretion in selecting whom to stop was adequately limited in that they stopped *all* northbound traffic.

After an evidentiary hearing, the trial court granted appellee's motion and ordered the marihuana suppressed. The State then appealed. *See* Tex.Code Crim. Proc. art. 44.01(a)(5). On appeal, a panel of the Thirteenth Court of Appeals reversed the order of the trial court and remanded the case for trial. *State v. Sanchez*, 800 S.W.2d 292 (Tex.App.—Corpus Christi 1990). The panel majority reasoned that "[t]he intrusion resulting from the brief stop [of appellee was] for constitutional purposes indistinguishable from the checkpoint stops upheld in [*United States v.*] *Martinez–Fuerte* [428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)] and [*Michigan Dept. of State Police v.*] *Sitz* [496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)]." *State v. Sanchez*, 800 S.W.2d at 298. A dissenting justice concluded, how-

ever, that under the Fourth Amendment, "officers acting without supervisory approval or control may [not] create a roadblock stopping all traffic to inspect driver's licenses, insurance, vehicle registration, and equipment." *State v. Sanchez*, 800 S.W.2d at 299 (Dorsey, J., dissenting). We granted appellee's petition for discretionary review because the justices of the court of appeals disagreed on a material question of law. *See* Tex.R.App.P. 200(c)(5).

### The Fourth Amendment

The Fourth Amendment, made applicable to the states by the due process clause of the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691–92, 6 L.Ed.2d 1081 (1961), guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fourth Amendment is implicated in this case because whenever a government official directs a vehicle to stop, however briefly, he has thereby "seized" the occupant, for the stop inevitably restrains that person's freedom of movement. *Michigan Dept. of State Police v. Sitz*, 110 S.Ct. at 2485.

The Fourth Amendment imposes a standard of "reasonableness" upon the exercise of governmental search-and-seizure powers in order to prevent arbitrary and oppressive interference with the privacy and personal security of individuals. *United States v. Martinez–Fuerte*, 428 U.S. at 554, 96 S.Ct. at 3081. The Fourth Amendment thus strikes a fair balance between society's need for public safety and order on the one hand and the individual's need for privacy and security on the other.

The test of reasonableness under the Fourth Amendment is not susceptible to precise definition or mechanical application, however. Rather, in evaluating the reasonableness of a particular seizure, a court must examine all the circumstances surrounding the seizure and the nature of the seizure itself, and then must sensitively balance the governmental need for the seizure against the intrusion on Fourth Amendment interests it entails. *United*

*States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985); *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Furthermore,

[a] central concern in balancing these competing considerations [must be] to assure that an individual's reasonable expectation of privacy is *not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.* To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, *or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.*

*Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (citations omitted; emphasis added).

The United States Supreme Court has never directly addressed the Fourth Amendment reasonableness of systematic, suspicionless stops at regulatory inspection checkpoints like the one at issue here, although the Court has strongly suggested, albeit in *dicta*, that such stops are generally permissible. *See Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) ("Questioning of all oncoming traffic at roadblock-type stops is one possible [way to inspect driver's licenses and automobile registrations]."). The Supreme Court *has* addressed, and upheld as reasonable, suspicionless stops at certain border and sobriety checkpoints. *See Michigan Dept. of State Police v. Sitz*, 110 S.Ct. 2481; *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116. And the Court has disapproved, as unreasonable, a system of suspicionless, random stops made by Delaware police in an effort to apprehend unlicensed drivers and unsafe vehicles. *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660. With this background in mind, I turn now to a balancing of the competing interests at stake here.

## The Governmental Need

It is abundantly clear that the state has "a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation," *Delaware v. Prouse*, 440 U.S. at 658, 99 S.Ct. at 1398, and hence that licensing, registration, liability insurance, and vehicle inspection requirements are being observed. It is equally clear that this strong state interest—at least with respect to statutory licensing and insurance requirements—cannot be adequately dealt with by more traditional law enforcement techniques involving case-by-case determinations of what persons are to be interfered with. In other words, it would be impractical to require law enforcement personnel to have a warrant or some level of individualized suspicion in this context. *Compare United States v. Martinez–Fuerte*, 428 U.S. at 557–562, 96 S.Ct. at 3082–85. This is so because, as common sense dictates, there is never an *observable* indication, from a moving vehicle, of a licensing or insurance statute violation. *See Higbie v. State*, 780 S.W.2d 228, 237 (Tex. Cr.App.1989) (plurality opinion).

It is also plain that highway checkpoints are reasonably effective in advancing the state interest in question. First, as noted previously, there is no practical alternative technique for detecting licensing and liability insurance violations. Second, highway checkpoints, if used with sufficient frequency, can act as substantial deterrents to licensing and liability insurance violations. Third, although the likely "success" in the sense of stop/apprehension percentages may be small, a checkpoint, wherever located,[1] will certainly reveal whatever percentage of the driving population that is in fact violating the licensing and liability insurance statutes. Finally, checkpoints are

"more efficient [than the random stops condemned in *Delaware v. Prouse* ] in the sense of bringing about a higher number of stops and thus discovery of a higher number of violations." 4 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.8(d), fn. 100.1 (2d ed. 1987 & Supp.1993).

A plurality of this Court holds the checkpoint stop of appellee unreasonable in part because there is an "absence of testimony or empirical evidence demonstrating the effectiveness of the roadblock." Op. at 170. I believe this one part of the plurality opinion is without solid foundation. Neither *Michigan Dept. of State Police v. Sitz, Delaware v. Prouse*, nor *United States v. Martinez–Fuerte* can reasonably be read to *absolutely require* the government to produce statistical evidence of effectiveness with respect to any particular law enforcement technique. What is necessary, under the Fourth Amendment, is for the courts to be satisfied that the technique in question is *reasonably effective* in advancing the governmental interest in question. *Michigan Dept. of State Police v. Sitz*, 110 S.Ct. at 2487; *Delaware v. Prouse*, 440 U.S. at 659, 99 S.Ct. at 1399; *United States v. Martinez–Fuerte*, 428 U.S. at 554, 96 S.Ct. at 3081. The point here is simply that, as a threshold matter, a seizure may not be deemed "reasonable" if it is accomplished by way of a patently ineffective—and thus fundamentally unreasonable—law enforcement technique. *See Delaware v. Prouse*, 440 U.S. at 659, 99 S.Ct. at 1399. And, as I have already demonstrated, there can be no serious dispute that highway checkpoints *are* reasonably effective in advancing the governmental interest in question.

---

1. It is important to recognize, as Professor La-Fave has, that

> in [*Delaware v.*] *Prouse* the [Supreme] Court indicated a checkpoint to check for drivers' licenses would be constitutional, though the success rate would not be higher [than it would be in a system of random stops]. While a DWI checkpoint might possibly be located on a street where accident statistics or the proximity of taverns suggests intoxicated drivers are most likely to be present, it seems unlikely that it is possible to position a license checkpoint in a location which is especially likely to be productive, and thus the success of the roadblock measured by the ratio of discovered violations to stops would not be greater than that from random stoppings....

4 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.8, fn. 100.1 (2d ed. 1987 & Supp.1993) (parentheses omitted).

### The Intrusion on Fourth Amendment Interests

The *physical* intrusion of the initial checkpoint stop on appellee's privacy and security was quite limited. The duration of the initial stop itself and the intensity of the investigation surrounding it were both minimal; no search was involved (initially), appellee was asked only a couple of simple questions, and he was not even required to leave his vehicle (initially).

The *psychological* intrusion of the initial stop was also quite limited. The checkpoint was conducted in such a manner that appellee could see that he was not being singled out for discriminatory treatment and that all vehicles were being detained routinely; he could see visible signs of the officers' authority, thus assuring him that the stop was apparently lawful and believed to serve the public interest; and he was not likely to be frightened or particularly annoyed by the intrusion.

In addition to the physical and psychological intrusions, however, we must consider the extent to which appellee's expectation of privacy and security was "subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown v. Texas,* 443 U.S. at 51, 99 S.Ct. at 2640. Here, the D.P.S. officers set up the checkpoint on their own initiative, without supervisory approval, and they did so without any written, departmental guidelines regarding the operation of the checkpoint. Obviously, such a situation presents a serious risk of abuse of discretion and, therefore, intrudes greatly on appellee's Fourth Amendment interest in being free of arbitrary and oppressive searches and seizures. *Compare Brown v. Texas,* 443 U.S. at 52, 99 S.Ct. at 2641; *Delaware v. Prouse,* 440 U.S. at 661, 99 S.Ct. at 1400. As one prominent commentator has observed,

> Quite clearly, the question of where and when [and how] a ... roadblock is to be conducted should not be left to officers in the field. Rather, what is needed is that these roadblocks be established by *a plan formulated or approved by executive-level officers of the law-enforcement agencies involved* which contains standards with regard to time, place and other matters. This is because in the absence of record evidence that the decision to establish the roadblock was made by anyone other than the officers in the field, the roadblock in question has certain characteristics of a roving patrol, namely, an appreciable risk of an arbitrary basis for the site or time decision.

4 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.-8(d), at 76 (2d ed. 1987 & Supp.1993) (footnotes and some punctuation omitted; emphasis added). *Accord Com. v. Amaral,* 398 Mass. 98, 495 N.E.2d 276 (Mass.1986); *State v. One 1987 Toyota Pickup,* 233 Neb. 670, 447 N.W.2d 243 (Neb.1989); *Webb v. State,* 739 S.W.2d 802, 808 (Tex.Cr.App. 1987) (2–judge plurality); *Simmons v. Commonwealth,* 238 Va. 200, 380 S.E.2d 656 (Va.1989).[2]

**2.** There is plainly no requirement under the Fourth Amendment for any kind of *legislatively-authorized, statewide administrative scheme* governing the use of highway checkpoints. Neither logic nor Supreme Court case law requires such a scheme. *See State v. Holt,* 852 S.W.2d 47 (Tex.App.—Fort Worth 1993, pet. pending) ("The Fourth Amendment's concern is preventing arbitrary seizures, not requiring statewide plans."). In applying the Fourth Amendment, it is not for the courts to decide which branch of government—executive or legislative—must authorize or draft guidelines for the operation of highway checkpoints. Nor is it our concern whether the guidelines are statewide or merely local. What *is* generally required under the Fourth Amendment is that the discretion of the officer in the field be kept at a minimum.

Although the Supreme Court, in *Michigan Dept. of State Police v. Sitz,* 110 S.Ct. 2481, stated that "politically accountable officials" rather than the courts should decide "which among reasonable law enforcement techniques should be employed," that language cannot reasonably be construed to mean that checkpoints are lawful *only* when set up according to legislatively-authorized, statewide administrative schemes. Other than the concurrence in *State v. Wagner,* 810 S.W.2d 207 (Tex.Cr.App.1991), which was, of course, *dicta,* and the lower court opinions that have construed it, *see State v. Wagner,* 821 S.W.2d 288 (Tex.App.—Dallas 1991, pet. ref'd); *King v. State,* 816 S.W.2d 447 (Tex. App.—Dallas 1991, pet. ref'd), we have found no authority anywhere suggesting that *Sitz* holds that the Fourth Amendment *requires* such schemes in order for checkpoint stops to be reasonable. Indeed, a careful reading of the Michigan Court of Appeals decision in *Sitz* reveals that the checkpoint plan under review

Police procedures are less threatening to Fourth Amendment interests when the discretionary authority of the officer in the field—and thus the primary risk of arbitrary action—is kept at an absolute minimum. If the discretion of the officer in the field is not kept at a minimum, then abuse of that discretion will inevitably occur, and the Fourth Amendment guarantee against unreasonable searches and seizures will be undermined.

In sum, the weight bearing on the first scale (the measure of the governmental need for highway checkpoints to inspect driver's licenses and insurance), although substantial, is counterbalanced *in this case* by the heavy weight bearing on the second scale (the measure of this particular checkpoint stop's intrusion on appellee's Fourth Amendment interest in privacy and security). Thus, I would hold the checkpoint stop here invalid under the Fourth Amendment, but I would further hold that had the checkpoint been conducted with executive-level approval and according to written, departmental guidelines, the delicate balance of competing interests *would certainly have led to a different result.*

With these comments, I join the judgment of the Court.

MEYERS, J., joins.

there was implemented at the direction of the Michigan Governor, not the Michigan Legisla-

ture. *Sitz v. Dept. of State Police,* 170 Mich.App. 433, 429 N.W.2d 180, 181 (Mich.App.1988).